**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER FERGUSON,** individually and on behalf of others similarly situated, | § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **CIVIL ACTION NO. 6:17-CV-00111** |
| **TEXAS FARM BUREAU BUSINESS CORPORATION, TEXAS FARM BUREAU CASUALTY INSURANCE COMPANY, TEXAS FARM BUREAU MUTUAL INSURANCE COMPANY, TEXAS FARM BUREAU UNDERWRITERS, FARM BUREAU COUNTY MUTUAL INSURANCE COMPANY OF TEXAS, SOUTHERN FARM BUREAU LIFE, INSURANCE COMPANY, and TEXAS FARM BUREAU,** | § § § § § § § § § § § § § § | |
| **Defendants.** | § | |

---

**SOUTHERN FARM BUREAU LIFE INSURANCE COMPANY'S
RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT ON EMPLOYEE STATUS**

---

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................ 1

LEGAL STANDARD........................................................................................... 3

ARGUMENT ....................................................................................................... 3

I.     THE FALSE ASSERTIONS OF FACT AND DISPUTED ISSUES OF MATERIAL FACT IN PLAINTIFFS' MOTION PRECLUDE SUMMARY JUDGMENT ............................................................................................... 3

      A.    Agency Managers Are Not "Assigned" To Agencies............................. 4

      B.    Farm Bureau Does Not "Assign" Or "Promote" Agents; Agency Managers Control The Recruiting Of New Agents To Their Agency, And The Termination Of Unproductive Agents ..................................... 5

      C.    Plaintiffs' False And Disputed Contentions Regarding Numbers Of Agents And The "Agent Factor"........................................................... 7

      D.    Plaintiffs' False Statements Regarding Advertising ............................... 8

      E.    Agency Managers Had Little Supervision And Managed Their Agencies As They Deemed Appropriate........................................................... 9

      F.    Plaintiffs' Contention That They "Didn't Control How They Received New Business Sources" Is False...................................................... 10

      G.    Plaintiffs' False Statements Regarding Selecting Office Staff............................. 11

      H.    Plaintiffs' Misleading Emphasis On The "Exclusivity" Of Their Contracts........ 11

II.    THE COURT SHOULD DISREGARD THE MAJORITY OF PLAINTIFFS' SUPPOSED "UNDISPUTED FACTS" REGARDING THE "CONTROL" FACTOR BECAUSE THEY ARE LEGAL OR REGULATORY REQUIREMENTS........................................................................................ 12

      A.    Summary Judgment Evidence Must Be Capable Of Presentation In Admissible Form, An Impossibility For Facts Irrelevant As A Matter Of Law ..................................................................................... 13

      B.    The Court Should Disregard The Legal And Regulatory Requirements That Plaintiffs Have Described As Purported "Facts" Showing "Control" ................. 14

## TABLE OF CONTENTS
(continued)

*Page*

    1.    "Control" over the price of insurance policies........................................... 15

    2.    "Control" over policy terms...................................................................... 16

    3.    "Control" over underwriting and application approval ........................... 16

    4.    "Control" over agent appointments .......................................................... 16

    5.    "Control" over advertising ....................................................................... 17

    6.    "Control" over offices, equipment, records, and security........................ 18

III.    PLAINTIFFS' ARGUMENTS UNDER THE ECONOMIC REALITY TEST ARE FACTUALLY DISPUTED AND LEGALLY ERRONEOUS ........................................ 18

    A.    Issues Of Fact Regarding "Control" Preclude Summary Judgment ..................... 18

    B.    Plaintiffs Apply The Wrong Legal Standard To The "Relative Investment" Factor, And Their Proof Fails Completely Under The Correct Standard ............ 22

    C.    The Evidence Shows That Plaintiffs' Control Over Their Opportunities For Profit Or Loss Is Consistent With Independent Contractor Status ...................... 25

    D.    The Skill and Initiative Required of an Agency Manager Weigh in Favor of Independent Contractor Status............................................................................... 28

    E.    The Permanency of the Relationship ..................................................................... 30

IV.    OTHER FACTORS CONSIDERED BY COURTS WEIGH IN FAVOR OF INDEPENDENT CONTRACTOR STATUS AND PRECLUDE SUMMARY JUDGMENT FOR PLAINTIFFS ...................................................................................... 32

    A.    Payment by Commissions Indicates Independent Contractor Status................... 33

    B.    Plaintiffs' Use Of Corporate Entities To Operate As Agency Managers Indicates That They Were Independent Contractors ............................................. 34

    C.    Plaintiffs' Tax Treatment Weighs In Favor Of Independent Contractor Status...................................................................................................................... 34

CONCLUSION............................................................................................................. 35

## TABLE OF CONTENTS
(continued)

*Page*

CERTIFICATE OF SERVICE ...................................................................................................... 37

Defendant Southern Farm Bureau Life Insurance Company ("SFB Life") hereby responds to "Plaintiffs' Motion for Partial Summary Judgment on Employee Status" (ECF No. 300-2) (the "Motion"). For the reasons set forth below, and in the response filed by the Texas Farm Bureau Defendants, Plaintiffs' Motion fails the requirements of Rule 56 and should be denied.

## INTRODUCTION

This case involves 12 unrelated individual Plaintiffs who were formerly contracted by the TFB Insurance Companies[1] and SFB Life (collectively, the "Insurance Companies" or "Companies") to act as agency managers in 12 different Farm Bureau insurance agencies, with different office environments, located in over 12 different Counties throughout the State. Plaintiffs expressly agreed in their contracts to operate *as independent contractors*, and were provided enormous freedom to determine their own schedules and to manage their agencies as they deemed appropriate. The Plaintiffs were also highly paid under a unique compensation system which guaranteed them substantial six figure income, regardless of the number of hours worked, with no dollar limit on the total compensation they could earn.[2] There is no question that Plaintiffs, several of whom operated their agencies through corporate entities, paying themselves and family members separate salaries, were not "follow[ing] the usual path of an employee." *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 386 (5th Cir. 2019) (reversing summary judgment for independent contractors claiming to be "employees" under the FLSA).

---

[1] The "TFB Insurance Companies" are Texas Farm Bureau Casualty Insurance Company, Texas Farm Bureau Mutual Insurance Company, Texas Farm Bureau Underwriters, and Farm Bureau County Mutual Insurance Company of Texas.

[2] *See* Defendants' Motion for Partial Summary Judgment on the Claims of Plaintiff Christopher Ferguson at 2, 5-6, 8-10 (ECF No. 308); Defendants' Joint Opposition to Plaintiffs' Motion for Partial Summary Judgment on the White Collar Exemptions at 3-5, 6-10 (ECF No. 315). This action was originally filed by Christopher Ferguson, a disgruntled former agency manager who was earning in excess of $400,000 per year. *See generally* ECF No. 308.

As the Fifth Circuit and other courts have recognized, the "determination of employee status is *very fact dependent*." *Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 334 (5th Cir. 1993); *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1539 (7th Cir. 1987) ("reality encompasses millions of facts") (Easterbrook, J., concurring).[3]  But Plaintiffs' Motion asks this Court to declare through "summary judgment," and directly contrary to Plaintiffs' Agency Manager Contracts, that each of the 12 Plaintiffs was an "employee" under the FLSA.  The Motion, however, relies on a litany of misleading and inaccurate factual statements that are patently false, vehemently disputed, or wholly unsupported by any admissible evidence.  It does not establish a record of undisputed material facts sufficient to sustain summary judgment.

Plaintiffs' suggestion that this case is "identical" to the Fifth Circuit's decision in *Hopkins v. Cornerstone*[4] is groundless.  *See* Motion at 1.  To begin, *Hopkins* was presented to the Fifth Circuit on interlocutory appeal based on "undisputed facts."  *Hopkins*, 545 F.3d at 342 (district court certified the question:  "Whether, under the undisputed facts, Plaintiffs are employees of Defendants or independent contractors."); *id*. at 343 ("we consider only the undisputed facts").  There is nothing "undisputed" about the purported "facts" set forth in Plaintiffs' Motion.  Indeed, some are so far removed from reality that they border on a Rule 11 violation.  Other of Plaintiffs' purported "facts" are entirely immaterial or no more than legal requirements that "*apply to work performed by employees and independent contractors alike*; [and] as such, they are not probative as to whether a working relationship is one of employment or independent contracting."[5]

Finally, the Motion completely ignores the most recent guidance from the Department of

---

[3] Unless otherwise stated, all emphasis is added and internal quotations omitted.

[4] *Hopkins v. Cornerstone America*, 545 F.3d 338 (5th Cir. 2008).

[5] Department of Labor, *Independent Contractor Status Under the Fair Labor Standards Act*, Notice of Proposed Rulemaking (Sept. 25, 2020), 85 Fed. Reg. at 60613.

Labor ("DOL") on "Independent Contractor Status Under the Fair Labor Standards Act," published September 25, 2020.  See 85 Fed. Reg. 60600-60639 (Notice of Proposed Rulemaking). Plaintiffs instead rely on older unpersuasive interpretations of "economic reality" factors that have been shown to be erroneous.  For all of these reasons, those set forth below, and for those set forth in the response filed by the TFB Insurance Companies, the Motion should be denied.

## LEGAL STANDARD

Summary judgment cannot be granted unless "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When reviewing a motion for summary judgment, a court may not make credibility determinations or weigh the evidence; those functions are reserved for the jury.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.*; *see also Tolan v. Cotton*, 572 U.S. 650, 660 (2014) ("By weighing the evidence and reaching factual inferences contrary to [the nonmovant's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.").  If fact issues are present, summary judgment must be denied.  *See, e.g.*, *Cubbage v. Averett*, 626 F.2d 1307, 1309 (5th Cir. 1980) (reversing summary judgment "[b]ecause we find that there were genuine issues of material fact in dispute").  Here, Plaintiffs' Motion is replete with inaccurate, disputed, and irrelevant "facts" that preclude summary judgment.

## ARGUMENT

**I.     THE FALSE ASSERTIONS OF FACT AND DISPUTED ISSUES OF MATERIAL FACT IN PLAINTIFFS' MOTION PRECLUDE SUMMARY JUDGMENT**

Plaintiffs present a misleading and incomplete picture of their roles as Farm Bureau agency managers.  A correct presentation precludes summary judgment.

## A.   Agency Managers Are Not "Assigned" To Agencies

Plaintiffs' Motion repeatedly asserts that agency managers are "assigned agencies" or "assigned counties" or assigned offices."  Motion at 2, 3, 21, 22 ("Farm Bureau typically assigns new Agency Managers to less-desired, smaller, rural offices"); *id.* at 23, 29.  These statements are factually false and unsupportable.  The Insurance Companies "do not 'assign' anyone to serve as an agency manager of any particular agency, and none of the Plaintiffs in this action were 'assigned' to any agency or county."[6]  Each of the Plaintiffs, and other agency managers in the Texas Farm Bureau insurance system, must apply, interview for, and if accepted enter a contract to manage a particular Farm Bureau insurance agency.  Each Plaintiff had complete control over whether to become an agency manager, which agency to select, if any, and in what county or counties they decided to manage an agency.[7]  Plaintiffs' mischaracterization of the agency

---

[6] Declaration of Sloan Brown, January 4, 2021 ¶ 7 ("Brown 1/4/21 Decl."), copy included as Exhibit A in the Appendix in Support of Defendants' Responses in Opposition to Plaintiffs' Motions for Partial Summary Judgment (cited as "App.").

[7] Defendants do not simply "decide[ ] which agents to promote to managers."  Motion at 13.  Ferguson, for example, voluntarily relocated twice.  After acting as an agent in Harris County for five years, Ferguson applied and interviewed to be a manager in Hockley and Cochran Counties.  Ferguson Dep. Vol. 2, ECF No. 312-1, at 55, 58.  A few years later, when the AM position in Matagorda County opened up, Ferguson decided to apply for the position because "[i]t was closer to Houston" and "was more money."  *Id.* at 60-65.  Plaintiff Brandon Wheeler similarly uprooted his family to contract as an AM in Gray and Roberts Counties.  Deposition of Brandon Wheeler at 250-51 (ECF No. 312-18) ("Wheeler Dep.").  Prior to contracting, Wheeler evaluated whether the move made economic sense to him in light of his projected commission income and the buy-out he would pay the prior AM.  *Id.*  Ricky Martin made the decision to move his family to Taylor County to contract as an AM.  Deposition of Ricky Martin at 188 (ECF No. 312-14) ("Martin Dep.").  Prior to contracting in Taylor County, Martin was offered a contract in Ector County, *id.* at 188-89, but the Taylor County position subsequently opened up, and Martin and his wife felt it was "a much better fit."  *Id.*  Ten years later, Martin voluntarily sought out an opening in Young County because he "was just ready to move out of Taylor County."  *Id.* at 44-45, 189-90.  Plaintiff Darryl Blackwell voluntarily relocated from Wichita County to be an AM in Scurry County because it was "an opportunity to make more money."  Deposition of Darryl Blackwell at 199-200 (ECF No. 312-9) ("Blackwell Dep.").

manager contracting process is but one example of a pattern and practice of deception relating to the issue of "control" that permeates Plaintiffs' entire Motion.

      **B.**      **Farm Bureau Does Not "Assign" Or "Promote" Agents; Agency Managers Control The Recruiting Of New Agents To Their Agency, And The Termination Of Unproductive Agents**

Plaintiffs' Motion states:  "As in *Hopkins*, Farm Bureau controlled the hiring, assignment, promotion, and firing of the agents the Agency Managers supervised."  Motion at 13.  This statement, repeated throughout the Motion, is false.  First, the Companies do not "assign" agents to an agency manager's agency.  Brown 1/4/21 Decl. ¶ 8; Declaration of David Hurt, January 4, 2021 ¶ 12 ("Hurt 1/4/21 Decl."), App. Exh. B.[8]  Second, the Companies do not unilaterally promote agents to Agency Manager.  Hurt 1/4/21 Decl. ¶ 10.  And third, once under contract,

> an agency manager has virtually complete control over recruiting new agents, including how to recruit, who to recruit, and how to advertise for recruiting.  An agency manager also has substantial control over whether to retain any unproductive agents, and substantial authority to bring in new agents by recruiting them, interviewing them, and proposing them to the Companies for appointment as an agent.

Brown 1/4/21 Decl. ¶ 8; Hurt 1/4/21 Decl. ¶ 12.  Agency manager recommendations for contracting new agents or terminating unproductive ones are followed by the Companies in the vast majority of cases.  Although the Insurance Companies must "appoint" and "contract" with an agent due to regulatory requirements, as a practical matter, an agency manager has far more control than the Defendants over identifying, recruiting, and contracting with new agents, and terminating any unproductive agents, in the agency manager's agency.  Hurt 1/4/21 Decl. ¶ 12; Brown 1/4/21 Decl. ¶ 8.  Plaintiffs provided no evidence of an instance in which they were prevented from contracting with a qualified new agent, or from terminating an unproductive agent.

---

[8] When an agency manager applies for an Agency Manager Contract, there may be one or more agents already under contract, of which the agency manager is aware.  Brown 1/4/21 Decl. ¶ 8.

Plaintiffs' testimony shows they had extensive "control" over the selection, recruiting, and contracting of agents in their agencies. Clements admitted he independently found and recruited prospective agents. *See* Deposition of Gary Clements, ECF No. 312-10 ("Clements Dep."), at 38 ("I recruited him[.]"). To find prospective agents, Clements did "a lot of advertising" and "promotion." *Id.* Once he found a prospect, he would then "bring them in" and "interview them." *Id.* If *Clements* felt like the prospective agent "was a good fit," he would contact his District Sales Manager ("DSM"), who would interview and discuss the prospect with him. *Id.* at 38-39; *see also* Lovelady Dep. at 36 ("I could decide if I wanted to pursue him as a prospective agent. And I would send that information to my district sales manager.").

Beakley, similarly, was "always" recruiting agents and taking out advertisements. Beakley Dep. at 25. He would "observ[e] people that [he] thought had a personality that may make them a good agent, and [he] pursued them." *Id.* Beakley testified to his skill in picking out good sales candidates when he was out to lunch or at other events merely by listening to them talk. *Id.* at 56-58. He performed all the first-round interviews for candidates and decided who he would pass along for testing by Defendants. *Id.* at 28. If a married agent candidate made it past testing, Beakley visited with the candidate's *spouse*. *Id.* at 28-29. Only then would the candidate be passed on to his DSM for an interview. *Id.* Beakley testified that he was so successful at recruiting agents to Guadalupe County, he increased the agency's total production by 250%. *Id.* at 154-55.

Blackwell likewise testified that he did not need permission from Defendants to post agent openings on CareerBuilder or in a newspaper, or to identify and interview a candidate for an agent position or to reject a candidate. Blackwell Dep. at 118-21, 126. Henry, Wheeler, and Clements gave similar testimony. *See* Henry Dep. at 37-38; Wheeler Dep. at 68-69; Clements Dep. at 180. In sum, Plaintiffs were the frontline of the agent contracting process with extensive authority and complete discretion in finding and selecting prospective agents for their agencies. Their

recommendations were "given great weight and are followed the vast majority of the time." Brown 2020 Decl. ¶ 10 (ECF No. 312-2); Deposition of Gary Wood at 48 ("Wood Dep."), App. Exh. J (stating that, as DSM, he "defer[s] to the [agency] manager" with regard to recruiting agents).

### C. Plaintiffs' False And Disputed Contentions Regarding Numbers Of Agents And The "Agent Factor"

Plaintiffs contend, erroneously, that "Farm Bureau also dictated how many agents the Agency Managers had to recruit and manage." Motion at 15. They further misrepresent the "agent factor" developed by TFB as "set[ting] the agency's number of agents," and claim that "[e]ven if they disagreed with how many agents were needed," they "had to recruit according to this agent factor." *Id*. These assertions are not accurate. Sloan Brown, the V.P. of Sales for the TFB Insurance Companies, expressly disagreed with the Plaintiffs' suggestion that TFB "sets the number of agents an agency is expected to have." Brown Dep. at 184 ("Q. … Is that correct? A. No."). Justin Ingram, one of two Associate State Sales Directors, likewise disagreed: "I don't think that … we tell an agency manager or suggest to an agency manager that they have to have this number of agents, so I disagree with that." Deposition of Justin Ingram at 12-13 ("Ingram Dep.), App. Exh. F.[9] Plaintiffs present no evidence that Defendants "dictate" the number of agents his or her agency can have. Nor does *any* Plaintiff present *any* evidence that he or she tried to recruit more agents than the Companies would allow. Rather, the record is clear that Plaintiffs had the necessary control and management authority to recruit and contract as many quality agents as they desired, and consequently, the Plaintiffs directly controlled any effect that the number of

---

[9] An "agent factor" reflects the number of agents it would take to reach the level of production anticipated for a particular agency. Brown Dep. at 184-85. "It's just a guide" (Ingram Dep. at 10-11), or metric for awarding incentives and bonuses. *See* Brown Dep. at 184-85. The agent factor is specific to each agency, depending on county population, number of clients in the agency, size of its book of business, and how long the AM and agents have been there. *See id.* at 186-87.

agents in their agencies could have on their income.

### D.    Plaintiffs' False Statements Regarding Advertising

Plaintiffs falsely state that "Farm Bureau controlled how the Agency Managers advertised." Motion at 16.  In practice and in "reality," however, "[t]he Insurance Companies do <u>not</u> control *how* or *the extent* to which an agency manager decides to advertise."  Brown 1/4/21 Decl. ¶ 14; Hurt 1/4/21 Decl. ¶ 16.  As the V.P. of Sales explained:

> Agency managers are, and the Plaintiffs were, free to advertise in any way they deemed appropriate.  Agency managers could advertise by radio, print ads, little league sponsorships, other youth team sponsorships, county fairs, rodeos, sporting events, concerts, livestock shows, or literally any other advertising of their own design; or they could choose not to advertise at all.

*Id*.; *see also* Hurt 1/4/21 Decl. ¶ 16.[10]  State insurance law, not Defendants, requires that agents (including agency managers) file a proposed advertisement with the insurer for approval before use.  *See* Declaration of Ernest Csiszar ("Csiszar Decl.") ¶ 24.g., App. Exh. C (citing Tex. Admin. Code § 21.122(c)).[11]  The only "control" the Companies exercise is required by regulation: (1) review to ensure the advertisement is not untrue, deceptive, or misleading, and (2) to "establish and maintain a system of control over the content, form, and method of dissemination of all advertisements concerning its policies."  *See* Csiszar Decl. ¶ 24.g. (quoting Tex. Admin. Code § 21.122(d)).

These ministerial and regulatory requirements do not limit the virtually unbridled discretion an agency manager has to advertise.  Nor does a contractual requirement to obtain prior

---

[10]  Deposition testimony also contradicts Plaintiffs' statement (Motion at 16) that "Agency Managers couldn't advertise for new recruits … unless [Farm Bureau] consented."  *Compare* Motion at 16 *with* Ingram Dep. at 25 ("I would say that's untrue."); Blackwell Dep. at 126-27 (discussing his decision-making authority with respect to recruiting advertising).

[11]  As a matter of convenience, SFB Life provided "pre-approved" advertising material that could be used, but agency managers were not required to use them.  Hurt 1/4/21 Decl. ¶ 17.

approval of an advertisement that uses a company's name or trademark constitute significant control for purposes of distinguishing between an independent contractor and an employee. As discussed below, compliance with legal obligations or quality control standards that apply equally to independent contractors and employees alike, have no probative value in distinguishing between the two types of relationships. *See infra* pp. 14-18. Moreover, no individual Plaintiff offers any actual evidence of a situation in which he or she was prevented from advertising. Any suggestion that the Companies "controlled," prevented, or limited the Plaintiffs from advertising is a complete fabrication.

### E.   Agency Managers Had Little Supervision And Managed Their Agencies As They Deemed Appropriate

Plaintiffs state: "Agency Managers perform their job duties *under the direction and oversight* of Farm Bureau's Sales Department." Motion at 6. In support, they cite three depositions of DSMs, none of which supports their proposition. *See id.* at 6 n.40. The testimony is nothing more than three DSMs acknowledging that a written job description for DSMs includes "responsibility for training and managing agency managers." It says nothing about "directing" or "overseeing" any agency manager in performing his or her duties. To the contrary, "Agency managers are not subject to supervision on a daily basis." Declaration of Sloan Brown ¶ 9 (ECF No. 312-2) ("Brown 2020 Decl."). In addition:

> Agency Managers … are given substantial authority and freedom to set their own schedules, to recruit and train new agents, to … grow their agencies and their income without limit, to determine the short-term and long-term business objectives of their agency, to determine the types and details of promotional and marketing activities in which they will engage, to engage in other businesses if they so choose, and to run and manage their agencies as they deem appropriate. Agency Managers do not need permission to take vacations or personal time off; they determine their own office hours; and their hours working under contract are not measured or monitored.

*Id.*; *see also* Hurt 1/4/21 Decl. ¶ 11.

**F.      Plaintiffs' Contention That They "Didn't Control How They Received New Business Sources" Is False**

On page 1 of their Motion, Plaintiffs contend that "[t]hey didn't control how they received new business sources."  Just the opposite is true.  Unlike the *Hopkins* case, where the insurance company "control[led] the distribution of sales leads—the 'lifeblood' of the business model—and prohibit[ted] sales leaders from purchasing leads from outside sources," 545 F.3d at 342, Plaintiffs and other agency managers do not depend upon sales leads.  Defendants did not give Plaintiffs or their agents leads (Whitney Dep. at 65); *Plaintiffs* decided whether to buy leads from a third-party. *See* Beakley Dep. 166-67 (discussing his preference for building relationships with local customers rather than buying leads); Lovelady Dep. at 52 (stating that she paid for a service to buy leads).

"Each Agency Manager is responsible for … growing the sales production of the agency as a whole" and "setting sales goals."  Declaration of David Hurt ¶ 8 (ECF No. 312-3) ("Hurt 2020 Decl.").  Plaintiffs and their agents engaged in varying activities to grow their books of business. *See* Beakley Dep. at 165-66 (his agency did "advertising" and "different things" to "help get the phones ringing"); Blackwell Dep. at 222 ("Q.  … Did [the agents who worked under you] go out and solicit new business?  A. Yes."); Peek Dep. at 230-31 (his agency participated in a chili cook off and football camp, ran ads, and sponsored Little League teams to promote the agency).

Many of Plaintiffs' agencies received walk-in and call-in business from new customers (*see* Beakley Dep. at 165; Blackwell Dep. at 170-71; Wheeler Dep. at 257), which was in no way "controlled" by the Defendants.  In addition, Plaintiffs' and their agents were able to build off of the agency's existing base of customers, which served as an unlimited source for new sales and referrals.  *See* Beakley Dep. at 167-68; Blackwell Dep. at 222; Clements Dep. at 43-46; Henry Dep. at 53.  Some AMs sold more actively.  *See* Lovelady Dep. at 104 ("[I]f I had a chance to write it, any new business, I took advantage of it."); Deposition of Brandon Peek, ECF No. 312-16

("Peek Dep."), at 226 ("Q.  When you were an agency manager, were you still writing new business?  A.  Some.").  Others focused more on servicing and developing their existing client base while directing new customers to their agents.  *See* Henry Dep. at 53 ("Any new business that came in, I let that go to my agents."); Wheeler Dep. at 215.  Beyond that, Plaintiffs, if they actively sold, or the agents in their agencies were responsible for originating their own sales, developing their own client bases, and making decisions on who they would pursue new business from.  *See* Wheeler Dep. at 221-22; Blackwell Dep. at 221-22.  How Plaintiffs received "new business sources" was entirely within their own control, and there is nothing in the record to the contrary.

### G.  Plaintiffs' False Statements Regarding Selecting Office Staff

Plaintiffs falsely state that "Agency Managers couldn't select" their own office staff.  Motion at 23.  Their own deposition testimony proves otherwise.  Lovelady, for instance, made it clear that she had and exercised the authority to hire secretaries for her offices.  *See* Lovelady Dep. at 13 ("She was the secretary in the Gun Barrel office.  … I hired her …."); *id.* at 23 ("Q.  So you made decision to hire, fire?  A.  Yes."); *id.* at 179 ("Q.  Did you also interview for secretary positions?  A. I did.  Q. Did you ever turn down any candidates or decide that they weren't a good fit as a secretary?  A. I did.").  Ferguson's testimony reflects the same.  *See* Ferguson Dep. Vol. 1 at 148 (he "hired" Kimberly Bryson "in the agency"); Declaration of Kimberly Bryson, ECF No. 312-6 ("Bryson Decl."), ¶ 2 ("I was hired by Christopher Ferguson …."); Brown 1/4/21 Decl. ¶ 10 ("Agency managers have substantial control over the staff in their agency offices and can recruit and hire and pay for, in whole or in part, Insurance Service Representatives ("ISRs"), who assist [the agency] in servicing new and prospective customers and increasing overall sales.").

### H.  Plaintiffs' Misleading Emphasis On The "Exclusivity" Of Their Contracts

Notwithstanding Plaintiffs' characterization of themselves as "captive," there is no evidence that the exclusive nature of the Farm Bureau Agency Manager Contract restricted or

impeded any Plaintiff's ability to earn income.  Plaintiffs fail to accurately describe the vast array

of products available to agency managers and the agents in their Farm Bureau agencies:

> Agency managers are not limited to selling a single product line or the
> products of a single insurance company.  Agency managers are managing a
> "multiline" agency with each agent and the agency manager authorized to
> sell a variety of property and casualty insurance products issued by the TFB
> Insurance Companies (for example, automobile, homeowners, liability, and
> crop insurance), life insurance and annuity products issued by SFB Life,
> and health and long-term care insurance offered through other companies.
> Agency managers are also authorized to sell a number of different
> preapproved products offered by companies other than the TFB Insurance
> Companies or SFB Life; these other company products are sometimes
> referred to as "brokerage" products. … Agency managers are free to request
> that additional products be approved for sale through the Companies'
> brokerage operations.

Brown 1/4/21 Decl. ¶ 16.  Plaintiffs' Motion also ignores the benefits of the exclusive arrangement:

> Some agents choose to distribute the products of a single company as
> exclusive [or captive] agents. Exclusivity has its advantages. Products do
> not conflict with each other; commission rates do not conflict with each
> other; and there is no confusion about which company's products to sell. By
> focusing on a single company's products, exclusive agents are also more
> likely to understand and explain even the minutiae of the products they sell
> in great detail. They are also more likely to gain greater support from the
> one company they represent.

Csiszar Decl. ¶ 17.  No Plaintiff has submitted evidence that they lost a sale because they could

not sell a competitive product.  The notion that exclusivity affected Plaintiffs' "opportunity for

profit or loss" has no record support and should be disregarded.  Fed. R. Civ. P. 56(c)(2).

## II.   THE COURT SHOULD DISREGARD THE MAJORITY OF PLAINTIFFS' SUPPOSED "UNDISPUTED FACTS" REGARDING THE "CONTROL" FACTOR BECAUSE THEY ARE LEGAL OR REGULATORY REQUIREMENTS

In addition to false factual statements, the majority of purported "facts" on which Plaintiffs

rely to show "control" are nothing more than legal or regulatory requirements that apply to the

business of insurance, regardless of whether an agency manager is an independent contractor or

an employee.  As the DOL recently explained, where regulatory requirements "apply to work

performed by employees and independent contractors alike …, *they are not probative* as to whether a working relationship is one of employment or independent contracting."  85 Fed. Reg. 60613. Because such requirements do not make a fact "more or less probable," they are not relevant to the independent contractor analysis.  *See* Fed. R. Evid. 401 (defining relevant evidence); Fed. R. Evid. 402 ("Irrelevant evidence is not admissible").  Pursuant to Rule 56(c)(2), SFB Life objects to Plaintiffs' improper use of legal and regulatory requirements as an argument for "control" under the economic reality test.  *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").[12]

## A.   Summary Judgment Evidence Must Be Capable Of Presentation In Admissible Form, An Impossibility For Facts Irrelevant As A Matter Of Law

At summary judgment, the material facts on which a movant relies must be "capable of being presented in a form that would be admissible in evidence." *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016).  "The admissibility of summary judgment evidence is subject to the same rules of admissibility applicable at trial." *Resolution Trust Corp. v. Starkey*, 41 F.3d 1018, 1024 (5th Cir. 1995).  The Advisory Committee's Note to the 2010 amendment to Rule 56 explains that an objection to a party's evidence shifts the burden to the party that submitted it "to show that the material is admissible as presented or to explain the admissible form that is anticipated."  Failure to satisfy this standard "permits the Court to disregard the evidence in deciding the motion for summary judgment." *Whiting v. Lambert*, 2020 WL 760409, at *3 (N.D. Tex. Jan. 23, 2020).

---

[12] This section addresses the materiality of facts on which Plaintiffs rely, not on whether they are undisputed. That is, this section shows that even if the facts discussed were deemed undisputed, they should still be disregarded on relevance grounds.

**B.    The Court Should Disregard The Legal And Regulatory Requirements That Plaintiffs Have Described As Purported "Facts" Showing "Control"**

While requiring workers to comply with the law "is an exercise of control in the most basic sense of the word," the Fifth Circuit explains that it "is not the type of control that counsels in favor of employee status." *Parrish*, 917 F.3d at 382.  Courts in this Circuit, accordingly, "routinely hold" that mandated compliance measures "do not demonstrate the level of control over the manner and method of work necessary to support employee status." *Clay v. New Tech Glob. Ventures, LLC*, 2019 WL 1028532, at *17 (W.D. La. Mar. 4, 2019) (citing cases).  The DOL's most recent proposed rules on independent contractor status under the FLSA similarly provide:

> Proposed § 795.105(d)(1)(i) clarifies that requiring an individual to comply with specific legal obligations, satisfy health and safety standards, carry insurance, … or quality control standards, or satisfy other similar terms that are typical of contractual relationships between businesses (as opposed to employment relationships) does not constitute control that makes the individual more or less likely to be an employee under the Act. These requirements frequently apply to work performed by employees and independent contractors alike; as such, they are not probative as to whether a working relationship is one of employment or independent contracting.

85 Fed. Reg. 60613 (Sept. 25, 2020); *see also id.* at 60639 (Prop. Reg. § 795.105(d)(1)(i)).[13]

In pervasively regulated industries, special care is warranted because the court is called on to separate myriad alleged "control" provisions required by "the overarching demands of" participation in the industry, and provisions imposed by the defendant ***over and above*** those compelled by regulation.  *See Perry v. Pediatric Inpatient Critical Care Servs.*, 2020 WL 1248263, at *15 (W.D. Tex. Mar. 16, 2020) ("Because of the overarching demands of the medical

---

[13] While non-binding, "a proposed regulation constitutes a body of informed judgment to which courts may draw on for guidance in the interpretation of relevant statutes." *Bolton v. Comm'r*, 694 F.2d 556, 561 n.10 (9th Cir. 1982); *Markham v. Salina Concrete Prods., Inc.*, 2010 WL 5093769, at *3 (D. Kan. Dec. 8, 2010); *see also Belt v. EmCare, Inc.*, 444 F.3d 403, 408 n.12 (5th Cir. 2006) (interpretive statements of agency, "while not controlling … do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.").

-14-

profession," fact that hospital maintained control over services rendered therein was not "a reliable indicator of whether the doctor is an employee or an independent contractor at the hospital.") (quoting *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997)).  Here, there is no dispute that "every aspect" of the insurance industry is heavily regulated. Csiszar Decl. ¶ 23.

Plaintiffs' Motion is filled with irrelevant "facts" that give it length but no substance. The Motion argues it is "undisputed" that Farm Bureau "controls" (i) the price and terms of its policies; (ii) the underwriting and approval of policies; (iii) the appointment of agents; (iv) advertising; and (v) the offices, records, IT, and equipment for the agencies where Plaintiffs worked.  Motion at 13-21.  While some of these arguments are factually inaccurate (*e.g.*, the Companies do not control how or the extent to which an agency manager decides to advertise), most are irrelevant regulatory requirements which are not probative of whether an agency manager is an independent contractor or employee.  Under Rule 56(c)(2), the Court should disregard such "facts," because "[i]rrelevant evidence is by definition immaterial and a proffer of it does not create an issue of material fact."  *McKeithen v. S. S. Frosta*, 430 F. Supp. 899, 905-06 (E.D. La. 1977).

### 1.    "Control" over the price of insurance policies

Plaintiffs assert that Farm Bureau controls the products it offers "and what prices to offer for those products."  Motion at 17.  The price charged for insurance coverage, however, may not be farmed out to independent contractors, employees, or any third party.  Csiszar Decl. ¶ 24.l ("prices or premiums charged to consumers by Farm Bureau Insurance Companies' agents and agency managers for policy coverage must be in accordance with premium rates that have been filed and approved by the [Texas Department of Insurance]").  Regardless of whether they are an independent contractor or an employee, price is controlled by state regulatory authorities. *See Gate Guard Servs. L.P. v. Solis*, 2013 WL 593418, at *6 (S.D. Tex. Feb. 13, 2013)

(control factor favored independent-contractor status where requirements were "either required by" OSHA or Texas state regulations).[14]

### 2.     "Control" over policy terms

The form of the insurance policies sold by the Farm Bureau Insurance Companies, including all of their contractual provisions, must be filed with the Texas Department of Insurance for review and approval.  Csiszar Decl. ¶ 24.m.  No agent, agency manager, or other individual, regardless of whether they are an independent contractor or employee, is permitted to change the contractual terms of an insurance policy that has been filed and approved by the TDI.

### 3.     "Control" over underwriting and application approval

Plaintiffs assert that Farm Bureau utilized and applied "underwriting guidelines," and "reserved a contractual right to reject *any* application for insurance."  Motion at 20-21.  All insurers must maintain and apply "underwriting procedures and guidelines," and the underwriter and risk bearer necessarily must approve any policy it insures.  Csiszar Decl. ¶ 24.n.  Any such "control" does not speak to employee status.  *See, e.g.*, *Jacobson v. Comcast,* 740 F. Supp. 2d 683, 691 (D. Md. 2010) (quality control procedures were not indicative of employment where they "stem[med] from the nature of their business and the need to provide reliable service to their customers").

### 4.     "Control" over agent appointments

Plaintiffs contend that Defendants' role in recruiting counsels in favor of employee status. Motion at 14.  But Farm Bureau's role is compelled by regulation. As an industry expert explains, "[b]efore a licensed agent may engage in the business of selling insurance for a particular insurer,

---

[14] That Farm Bureau "exclusively set the bonus and commission rates for new policies and renewals on these books of business," Motion at 19, is also irrelevant. *See Lockett v. Allstate Ins. Co.*, 364 F. Supp. 2d 1368, 1377 (M.D. Ga. 2005) ("[t]he bonuses, awards, and prizes Defendant offers" to insurance agents "do not rise to the level of control or influence over Plaintiff's daily business, these awards merely serve to reward productivity over an extended period").

that agent must be 'appointed' to act as an agent by an insurance company authorized to do business in Texas."  Csiszar Decl. ¶ 21 (citing Tex. Ins. Code § 4001.201).[15]  That means "***every*** agent and agency manager who contracts" with Farm Bureau "***must*** be … appointed by each of the Companies before that agent can legally act as an agent," *id.*, and "[a]gency managers cannot [legally] appoint their own agents." *Id.* Where, as here, such "constraints [are] imposed by … government regulations," they "do not determine the employment relationship." *See FedEx Home Delivery v. N.L.R.B.*, 563 F.3d 492, 501 (D.C. Cir. 2009).[16]

### 5.    "Control" over advertising

Plaintiffs argue that "Farm Bureau also controlled, at least partially, the advertising for new recruits and insurance products."  Motion at 16.  First, as discussed above, this statement is inaccurate. If Plaintiffs are referring to the Companies' need to review and approve ads, that is necessary because "[i]nsurance advertising is highly regulated." Csiszar Decl. ¶ 25.g.  The Companies must comply with substantive legal requirements (relating to truthfulness and accuracy) and the procedural requirement to maintain a specimen copy of all ads along with certain information required by law. *Id.* (citing applicable statutory provisions). This Court, quoting the Fourth Circuit, has held that such requirements do not speak to employee status. *See Perry*, 2020 WL 1248263, at *15 (measures taken by Defendants to avoid "exposing themselves to recognized professional liability" not probative of employee status); *see also Lockett*, 364 F. Supp. 2d at 1378

---

[15] That Farm Bureau "barred" Plaintiffs "from subcontracting or assigning their duties without Farm Bureau's consent," Motion at 15, is irrelevant, because of the same regulatory requirements.

[16] Plaintiffs also assert that they were "captive" because of exclusivity provisions in their contracts. Motion at 1, 3, 5.  However, "[a]n insurance agent's status as a captive agent,..., is no more determinative of the [control] issue presented than, for example, a manufacturer's representative's agreement to market the manufacturer's products exclusively." *Alfred v. Tenn. Farmers Mut. Ins. Co.*, 8 F. Supp. 2d 1024, 1028 (E.D.Tenn.1997); *Lockett*, 364 F. Supp. 2d at 1378 (Plaintiff's "inability to sell insurance for other companies" does "not make him an employee of Defendant").

("advertising restrictions do not make Plaintiff an employee."); *Oestman v. Nat'l Farmers Union Ins. Co.*, 958 F.2d 303, 306 (10th Cir. 1992) (pre-approval of advertising "is not the type of control that establishes an employer/employee relationship").

### 6.    "Control" over offices, equipment, records, and security

Plaintiffs assert that Farm Bureau both metaphorically and literally holds the "keys" to Farm Bureau agency offices.   Motion at 22-23.  Texas insurance law imposes monitoring, recordkeeping, security, information technology, antifraud, complaint handling, and other requirements on insurers that mandate Farm Bureau's involvement in the selection of offices, the security of those offices, the materials in those offices, and access to those materials.  Csiszar Decl. ¶¶ 24.a, 24.b, 24.c, and 24.d.  These requirements do not relate to employee status. *See Moreau v. Air France*, 356 F.2d 942, 951 (9th Cir. 2004) (measures taken "to ensure compliance with various safety and security regulations" do not speak to the issue of "direct control"); *Jones v. Norfolk Southern Co.*, 348 F. App'x 970, 2009 WL 3346127, at \*3 (5th Cir. 2009) (Defendant's absolute right to bar Plaintiffs from facility did not make it employer).

In sum, the Court should exclude or disregard all evidence proffered by Plaintiffs in their Motion that is compelled by legal compliance.  Fed. R. Civ. P. 56(c)(2).

## III.   PLAINTIFFS' ARGUMENTS UNDER THE ECONOMIC REALITY TEST ARE FACTUALLY DISPUTED AND LEGALLY ERRONEOUS

### A.    Issues Of Fact Regarding "Control" Preclude Summary Judgment

The ultimate question in the independent contractor analysis is whether the agent is "in business for himself."  *Thibault v. Bellsouth Telecomms, Inc.*, 612 F.3d 843, 849 (5th Cir. 2010). This question involves *all* of the facts and circumstances surrounding the alleged "employment." *Id*. at 848-49 (noting determination of employee status was "highly dependent on the particular

situation"); *Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 334 (5th Cir. 1993) (determining employee status under FLSA "is very fact dependent").

"Control" as an economic realities factor "is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1049 (5th Cir. 1987). The control inquiry ultimately focuses on whether the purported employer controls the "manner or method" of the plaintiffs' work. *See, e.g.*, *Carrell*, 998 F.2d at 332-33 (finding no control where the defendant's "customers dictated the specific" procedures and equipment required for each project). In *Parrish*, for example, the lack of control over the "manner or method" of the work of drilling consultants – or *how* the drillers completed their directional-drilling calculations – was critical to the Court's finding that the drillers were independent contractors.  917 F.3d at 381.  Similarly, Plaintiffs here are all seasoned insurance professionals who have provided no evidence that the Defendants controlled any aspect of "how" they sell and service their agencies' books of business.

Agency Managers decide the methods and means they will use to generate additional sales through their existing book of business, to bring in new business and new sales, and coaching, training, recruiting, and assisting agents in the sales process.  The agencies handle walk-in and call-in business from new and existing customers, which is in no way restricted or funneled by the Insurance Companies.  Brown 01/04/21 Decl. ¶¶ 11-12; Hurt 01/04/21 Decl. ¶ 18.  As set forth above, Plaintiffs' compensation was not controlled by sales "leads" generated by the Insurance Companies. Rather, Agency Managers originate their own sales.  Wheeler Dep. at 221-22; Blackwell Dep. at 221-22.  New business sources are therefore entirely in their control, and an Agency Manager can sell an insurance policy anywhere in the State of Texas.  Brown 01/04/21 Decl. ¶¶ 11-12; Hurt 01/04/21 Decl. ¶ 18; *see generally supra* section I.F.

Plaintiffs' conclusory statement that "[t]he Agency Managers perform their job duties *under the direction and oversight* of Farm Bureau's Sales Department" (Motion at 6) does not establish that Defendants controlled how they performed their critical duties.  The *Parrish* court was unpersuaded by the drillers' similar argument that they were "controlled" by the company because they had to follow company policies and procedures, including where and when to report to a job assignment and drug testing and safety requirements. *Id*. at 382.  Nor were plaintiffs in *Parrish* considered employees merely because of safety training and drug testing requirements, which "is not the type of control that counsels in favor of employee status." *Id*.; *see also Clay*, 2019 WL 1028532, at *17 (quality controls and safety standards do not demonstrate the level of control over the manner and method of work necessary to support employee status); 85 Fed. Reg. 60613 (Sept. 25, 2020) (requiring individuals to comply with legal, health or safety standards, or to carry insurance or satisfy other contractual obligations, is not probative of as to whether a working relationship is one of employment or independent contracting).

As the record submitted by Defendants and discussed above demonstrates, significant and material disputed issues of fact exist as to the "control" factor in this case.  *See generally* Sections I and II, *supra*.  A fact-finder will also ultimately need to make credibility determinations based on the record as a whole, not from the cherry-picked and misleading snippets from the record Plaintiffs highlight in their Motion.  A few examples illustrate this point:

- **Darrell Beakley** claims his District Manager Gary Wood exercised significant control over him. Yet he concedes that he only spoke to Wood for ten minutes "once or twice a week," saw him once-a-month face-to-face, and exchanged less than ten weekly substantive emails. Beakley Dep. at 20-23.  He also concedes that he set his own schedule in the office and was never instructed when he had to be in the office in the morning.  *Id*. at 135-36. Beakley also claims that Wood required him to attend District meetings, *id*. at 124-28, which both Wood and District Manager Jon Sharp, who became Beakley's District Manager before his termination, deny.  Wood Dep. at 117-18; Sharp Dep. at 86; 92-93; 171; *see also* Ingram Dep. at 233.  Wood also denies Beakley's testimony that Beakley needed Wood's permission to be out of the office. *Compare* Wood Dep. at 118 *with* Beakley Dep. at 129-30. And six months after his

Agency Manager contract terminated, he voluntarily re-contracted with his Farm Bureau "family" as an independent contractor agent. *Id*. at 197-203 & Exh.13.

- **Daryl Blackwell** admits he operated as an independent contractor for the majority of his tenure as an Agency Manager. Blackwell Dep. at 207-08. His claim that the position evolved into an "employee" status over time, *id*. at 208-09, will have to be contrasted with his testimony concerning his current position as a captive agency owner for Farmers Insurance. He admitted that Farmers regulated and controlled his approval to purchase of the agency, and conceded that Farmers continues to impose various conditions and requirements on him, including that he enter into a non-compete agreement, seek approval for all advertising and use of the company logo, submit all potential agents and staff to credit and background checks before he could hire them, and otherwise adhere to company guidelines. *See generally* Blackwell Dep. 10-73. According to Blackwell, however, *none* of this control constituted an indicia of an employment relationship. *Id*.

- **David Henry** contends he was an employee and not an independent contractor because 1) he had to attend meetings, 2) agents had to pass Farm Bureau credit and aptitude tests before hiring and 3) he allegedly had to get permission from Jon Sharp to take a vacation or day off. Henry Dep. at 105-106; 177. Sharp denies that any meeting was mandatory for agency managers, Sharp Dep. at 171; Ingram Dep. at 233, or that any agency manager needed his permission to take time off. Sharp Decl. ¶ 4. Nor did Henry even recruit any agents during any time relevant to this lawsuit, as San Jacinto had two long-tenured agents there. Henry Dep. at 211-13. He testified, however, that when he was actively recruiting agents in past years, he alone decided who would be a good candidate and initial interviews without Farm Bureau's permission. *Id*. at 37-38.

- **Ricky Martin** contends that he felt "from day one" that he was an employee because his supervisors "basically told me every move to make." Martin Dep. at 35. This included having to seek permission from District Manager Dan Hightower to take a vacation, *id*. at 100, and an alleged directive from Hightower to do expensive television and billboard advertising in his agency in 2014. *Id*. at 145-47. Martin's testimony stands in contrast to Plaintiff Daryl Blackwell, who denies that he was ever directed by Hightower or anyone at Farm Bureau to use a particular mode of advertising, or that he needed Hightower's permission to take a vacation or to be out of the office for personal reasons. Blackwell Dep. at 126-127; 83-85. Finally, Martin spins a tale that Chris Whitney told him his Agency Manager contract was terminated because he went out of town for two days to officiate a wedding ceremony, Martin Dep. at 18-19, which Whitney flatly denies. Whitney Dep. at 157-59. Rather, Martin had been an underperforming agency manager, struggling for years. Whitney Dep. at 157-59.

- Finally, **Brandon Wheeler** complains that Farm Bureau had the final say in whether an agent received a contract and had to approve any agent recruiting advertising. ECF 302-4, ¶ 16. Yet he testified that he alone controlled who he brought to Farm Bureau as potential agent candidates. Wheeler Dep. at 69. He also states that one of his responsibilities was to "recruit and to bring what *I felt like* … was qualified candidates

or candidates that *I felt* would by a good fit into my agency." *Id*. at 68 (emphasis supplied).  Because he was "constantly aware of people" and always directing his conversations towards looking for who would be a good fit as a Farm Bureau agent, Wheeler is unabashed about claiming overtime for the time he spent at his son's sporting events talking to coaches and other people.  *Id*. at 230-31.  And without Farm Bureau's approval, he split the cost of advertising for open agent positions with other agency managers.  *Id*. at 70; 75-79 and Exh. 6.

As these examples of demonstrate, factual disputes are replete throughout the record. Therefore, summary judgment on the issue of whether Defendants' purported "control" over Plaintiffs' agency operations balances the scales in favor of "employee" status is unwarranted.

### B.   Plaintiffs Apply The Wrong Legal Standard To The "Relative Investment" Factor, And Their Proof Fails Completely Under The Correct Standard

The section of the Motion devoted to the parties' "relative investment" in their enterprises is entirely misguided on the facts and the law. Motion at 24-26. Plaintiffs assert that the "most any Plaintiff spent in a single year" on his or her agency business "was about $220,000," and compare that to what Southern  Farm Bureau and the Texas Farm Bureau Defendants, respectively, invested in their entire **state-wide** insurance enterprises. Motion at 25-26. Having found, unsurprisingly, a mismatch between the figures, they declare that the second *Silk* factor favors employee status. *Id.* at 25 (stating comparison "wasn't even close").

This comparison, of course, is meaningless, and is not how courts in the Fifth Circuit, or any circuit, interpret *Silk's* "investment in facilities" factor. *Silk*, 331 U.S. at 716. Plaintiffs go astray by reading *Hopkins'* statement that "[t]his factor compares 'each worker's *individual* investment to that of the alleged employer'" as a comparison between individual and **company-wide** investments. While *Hopkins* says that the plaintiffs' investments should **not** be aggregated, it does not state that the defendant's company-wide expenses **should** be aggregated. *See Hopkins,* 545 F.3d at 344. Before setting forth the law that squarely rejects this interpretation of *Hopkins*, it is worth observing that it is necessarily wrong, because were it not, no company of any significant

size could *ever* prevail on this factor. The economic realities test does not consider the *size* of the alleged employer, and doing so would not make sense, because "[l]arge corporations can hire independent contractors, and small businesses can hire employees." *Karlson v. Action Process Serv. & Private Investigations, LLC*, 860 F.3d 1089, 1096 (8th Cir. 2017) (affirming rejection of comparison of individual's investment to the defendant's "total expenses," which "has little relevance to determining whether" plaintiff was  "an employee or an independent contractor").

The Fifth Circuit does not apply Plaintiffs' nonsensical rule. In *Lopez v. Reliable Clean-Up & Support Servs., LLC*, the plaintiffs, relying on *Hopkins*, asserted that their investments in Defendant's cleaning business were "small-ticket" when "compared to defendants' expenses in maintaining corporate offices and other items needed to maintain a business with $1.5 million in annual sales." 2018 WL 3609271, at *9 (N.D. Tex. July 27, 2018). The court explained that this was the wrong comparison, and that *Hopkins* did not support it:

> Plaintiffs reliance on *Hopkins* is misplaced. The relevant investments are *not* those contributed to the defendants' business *as a whole*, but instead "the amount the alleged employer and employee each contribute to *the specific job* the employee undertakes." *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 847 (5th Cir. 2010) (emphasis added) (citing *Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 333 (5th Cir. 1993)).

*Id.*  Under the correct legal standard, Plaintiffs do not come close to establishing a lack of material fact questions on the relative investment factor, for a straightforward reason: they do not identify *any* evidence of what *any* Defendant invested in *any* "specific job" undertaken by *any* Plaintiff. The grand total of Plaintiffs' facts regarding Defendants' investments are the following:

- "Southern Farm Bureau spent $186 million on 'General Expenses' in 2014 according to that year's Annual Report, and $184 million in 2019."

- "Texas Farm Bureau Mutual Insurance Company spent $107 million and Texas Farm Bureau Casualty Insurance Company spent $190 million on operating expenses in 2017."

- "In 2017, Texas Farm Bureau … paid about $47 million to … employees and almost $39 million a year to pay agents and agency managers."

- "Just paying the 11 senior managers in its Sales Department, who are classified as employees, costs Farm Bureau over $2 million annually."

Motion at 25. As may be obvious, that is not close to enough information to permit the Court to calculate Defendants' actual costs **per agency manager** position. The amounts paid to "agents" and "employees" are not related **whatsoever** to Defendants' investments in those positions. The "General" and "Operating" expenses cited contain broad categories of expenses – like claims investigation and settlement expenses, legal expenses, salaries, and many more – that have nothing to do with agency managers. *E.g.*, Pls'. Ex. 52 at 11; Pls. Ex. 53 at 11. The exhibits from which these figures are drawn, because they are Texas-wide, cover agencies and counties where no Plaintiff ever worked, ever managed an agency, or ever sold a policy.

Aside from Plaintiffs' clear failure of proof, there is no reason to believe that Defendants' investments in each Plaintiffs' position exceeded that of each Plaintiff, respectively. As a matter of basic economics, the fact that Defendants **are** large companies means that their costs are spread across a broader base of sales and purchases, and thus are typically **lower** relative to similar costs required of Plaintiffs. It also means that Defendants are likely to have greater purchasing power, and thus access to lower prices, vis-à-vis each Plaintiff.

In any event, the current record precludes a conclusion that Defendants' investment in the "specific job" was always, or ever, greater than "about $220,000" per year (or any other figure in the Motion) for each, or any, Plaintiff. Motion at 25. Instead, it indicates Plaintiffs were required to "buy out" the previous agency manager at their contracted agency, pay some or all of their agencies' rent, staff salaries, advertising, supplies, outside sales expenses (*e.g.*, lunch or dinner, or other entertainment, for clients or potential clients), tax and accounting fees, salaries for additional personnel, vehicles, mileage, and all manner of additional expenses associated with running their

own, multi-million dollar enterprises. *See infra* Sec. IV.B and C. Given Plaintiffs' failure of proof on Defendants' expenses per "specific job," the relevant investment factor favors Defendants.

### C.    The Evidence Shows That Plaintiffs' Control Over Their Opportunities For Profit Or Loss Is Consistent With Independent Contractor Status

Plaintiffs contend that the opportunity for profit factor favors employee status because, in sum, Defendants had "exclusive control over the products, price, advertising, agent hiring and assignment, office location, office expenses, commission rates, the discretion to issue policies, and ownership and control of the books of business." Motion at 27. "Control" over these elements of Plaintiffs' businesses, however, is either legally irrelevant or materially contested. In reality, the evidence on this factor strongly favors independent contractor status.

As an initial matter, and as SFB Life addresses at length in section II of this brief, Defendants' involvement in the creation, issuance, approval, and sale of insurance products, the setting of price, the review and approval of advertising, and in the selection and security of agency offices is compelled by the web of state and federal regulations applicable to each and every aspect of the business identified. Csiszar Decl. ⁋⁋ 20-26; Brown 01/04/21 Decl. ⁋ 5; Hurt 01/04/21 Decl. ⁋ 6. Such "[g]overnment regulations constitute supervision not by the employer but by the state." *Democratic Union Organizing Committee v. NLRB*, 603 F.2d 862, 875 (D.C.Cir.1978). They would impact Plaintiffs' opportunity for profit regardless of how they were classified.

Plaintiffs also contend that Farm Bureau's alleged ownership of the "book of business" means it controls Plaintiffs' opportunity for profit. Motion at 18-9. But it is not the ultimate ownership of those policies that matters, but the opportunity to profit from those policies. For example, in an FLSA case finding an insurance agent was an independent contractor, the court found it persuasive that "exclusive agents operating under the same contract" as Plaintiff "were able to amass large books of business that generated significant profits for the agent," in

supporting its holding. *See Daskam v. Allstate Corp.*, 2012 WL 4420069, at *2 (W.D. Wash. Sept. 24, 2012). In another FLSA case finding an insurance agent was an independent contractor, the court noted that plaintiff's "lack of vested benefit in his book of business" did not preclude finding he was an independent contractor in light of the "high degree of control [he] exercised over the manner in which he operated his business; (2) the fact that [he] personally incurred most of his business expenses; and (3) the fact that [he] bore the burden of risk of loss from his business as an NOA." *Butts v. Comm'r*, 66 T.C.M. (CCH) 1041 (T.C. 1993), *aff'd,* 49 F.3d 713 (11th Cir. 1995).[17]

Where not immaterial as a matter of law, Plaintiffs' assertions regarding their opportunity for profit are disputed. As noted, Plaintiffs' contentions that Farm Bureau controlled advertising, recruiting, hiring, and firing are untrue.  Their contention that AMs may not and do not reach agreements with agents regarding salaries, reimbursement, and the assignment of accounts is false. For example, Plaintiff Ferguson testified that he did entered into contracts with his agents to reimburse him for some amount of the salary expenses Ferguson was obligated to pay the County Farm Bureau. Ferguson Dep. at 43-44.

Likewise, Plaintiffs' contention that "demanding hours and production expectations … effectively barred" them "from operating any other business," Motion at 27, is disputed, as many Plaintiffs operated outside businesses, and others could have if inclined. Wheeler Dep. at 43-48 (oil wells); Martin Dep. at 156 (oil wells); Wheeler Dep. at 38-39, 50, 173, 287-89 (real estate, rentals, and cattle farming); Stanton Dep. at 32 (family farm); McCord Dep. at 94-97, 242 (dog

---

[17] Ownership of the policies also facilitates regulatory compliance, which does not speak to control over the opportunity to profit. *See Lockett*, 364 F. Supp. 2d at 1377–78 ("Plaintiff points out that ***Defendant owns the insurance contracts he sells.*** Because these contracts are Defendant's property, Plaintiff must maintain his … business records for inspection by Defendant …  However, this reporting requirement is not an attempt to exercise control over how Plaintiff sells insurance … on a daily basis, rather it is a way to monitor results and insure accuracy.").

breeding); Cook Dep. at 203-05 (antiques); Clements Dep. at 203, 206-09 (competitive roping); Blackwell Dep. at 157-158; 163 (roping and farming); Beakley Dep. at 117, 120-21 (show hogs).

Their insinuation that because an Agency Manager typically manages just one agency in one county means that Plaintiffs were limited territorially in expanding their businesses is also wrong. Motion at 21-22. "An Agency Manager can sell an insurance policy anywhere in the State of Texas," as can the agents through whom an AM earns commissions. Hurt 01/04/21 Decl. ¶ 18; Brown 01/04/21 Decl. ¶12. Defendants also dispute the notion that AMs are "assigned" by fiat to agencies and locations. Hurt 01-04-21 Decl. ¶ 10; Brown 01/04/21 Decl. ¶ 7.

While Plaintiffs have failed to carry their burden without more, other facts show Plaintiffs, not Farm Bureau, controlled their opportunities for profit. They controlled recruiting and advertising. Hurt 01/04/21 Decl. ¶ 12; Brown 01/04/21 Decl. ¶ 8. They controlled their agencies' staffing. Hurt 01/04/21 Decl. ¶ 15; Brown 01/04/21 Decl. ¶ 10.  They earned commissions from numerous sources, with no cap, and it is in the very *nature* of a commission to shift control over the size of one's paycheck from the employer to the worker. And Defendants did not provide Plaintiffs with "sales leads" (unlike in *Hopkins*), as Agency Managers were responsible for developing their own businesses. Hurt 01/04/21 Decl. ¶ 18; Brown 01/04/21 Decl. ¶ 11.

Finally, the opportunity for profit or loss is both greater and materially distinguishable from the same opportunities in *Hopkins*. Upon taking over management of an agency, Agency Managers "buy out" the previous Agency Manager, a substantial investment. Beakley Dep. at 67; Blackwell Dep. 199-201; Henry Dep. 103-104; Lovelady Dep. at 24; Martin Dep. at 169-170; Peek Dep. at 112. Upon leaving Farm Bureau, the process is reversed, with the new Agency Manager buying out the departing manager. As Ferguson explained, "[t]he understanding is that I pay the guys that I replaced and then the guy that replaced me pays me." Ferguson Dep. at 114.

The buy outs are "an incentive to the Agency Manager to continue to invest and grow the agency's book of business." Hurt 01/04/21 Decl. ¶ 22; Brown 01/04/21 Decl. ¶ 23.  The size of the buyout is in an Agency Manager's control, as it depends on how her agency performs.  There are **no** buy-in or buy out payments discussed in *Hopkins*, so its holding does not address how this factor impacts an Agency Manager's opportunity for profit. And, as a more general matter, where the Agency Managers here essentially acquire an interest in the agency's revenue, and then effectively sell that interest upon termination, a finding that Plaintiffs are "separate economic entities" and "in business for themselves" should follow, as it is uncommon for "employees" to place capital at risk in exchange for a potentially lucrative reward, upon taking, and leaving, a job.

Analysis of this factor weighs in favor of Defendants. At a minimum, material fact questions preclude a finding that this factor counts in favor of employee status.

### D.   The Skill and Initiative Required of an Agency Manager Weigh in Favor of Independent Contractor Status

Courts also look to "the skill and initiative required to perform the job" when analyzing independent-contractor status. *Thibault*, 612 F.3d at 846.  "Greater skill and more demonstrated initiative counsel in favor of [independent contractor] status." *Parrish*, 917 F.3d at 385.  Here, Plaintiffs represent that they took "little initiative" and had "no special skill."  Motion at 28-29. Their position is disputed, and the evidentiary record does not support their attempt to cast themselves as run-of-the-mill managers who operated robotically under the control of Defendants.

Farm Bureau agency managers are "highly compensated and highly skilled with deep knowledge and understanding of the TFB and SFB Life products, insurance regulatory requirements, underwriting guidelines, and the ability to effectively motivate sales and manage agents and office personnel."  Brown 1/4/21 Decl. ¶ 13.  They "are generally former Texas Farm Bureau insurance agents…" *Id.*  The mere fact that Defendants generally contract Texas Farm

Bureau agents or agency managers to fill open agency manager positions *in and of itself* demonstrates that the position is specialized.  That Defendants freely eliminate most of the eligible workforce from consideration for the position demonstrates, as a matter of basic economics, that the position requires discrete, specialized skills and knowledge. If it did not, it would not make economic sense for Defendants to constrict the class of potential agency managers so tightly.

While the Motion generalizes about what agency managers apparently "didn't need" in terms of education, training, and the like (Motion at 29), it ignores what the *Plaintiffs* actually had and did.  *Cf. Parrish*, 917 F.3d at 386 ("After all, at issue is not what plaintiffs could do, only what they did.").  Ferguson, for example, had a degree in Business Administration and a specialized professional designation (LUTCF) in the life insurance industry.  Ferguson Dep. Vol. 2 at Exhs. 40 and 41.  Prior his termination, Ferguson had more than 12 years of experience as an agent and agency manager.  Ferguson Dep. Vol. 2 at 51-52.  He sold hundreds, if not thousands, of Texas Farm Bureau auto policies (Ferguson Dep. Vol. 1 at 49) along with all of the other life and property and casualty products Defendants offered.  Ferguson Dep. Vol. 2 at 74-75.  He had experience selling windstorm and flood insurance on Texas's seacoast.  *Id.* at 67-68.  He described himself as an "entrepreneurial professional with extensive experience in new business expansion and market growth.  *Id.*  As an agency manager, he "[r]ecruited, trained, and supervised highly-productive sales teams"; "[d]eveloped annual organizational budgets"; and "designed and implemented comprehensive marketing plans."  *Id.*  Ferguson believed he had multiple "areas of expertise," such as "new business development," "marketing and branding strategy," "strategic problem solving," and "complex data analysis."  *See id.* at Exh. 40.  When asked where he received this experience, he confirmed it "obviously" came from his work as a Texas Farm Bureau agency manager.  *See id.* at 119-20.  By Ferguson's own description, he not only had the skill necessary

to perform as an agency manager but developed "expertise" regarding his core duties.  These are not skills "common" to every manager.

Agency managers also exercised significant, independent initiative.  Lovelady provides a prime example, having researched and opened a branch office she thought would benefit and increase the agency's business.  *See* Lovelady Dep. at 150-52.  To grow her agency, she actively recruited agents and hired ISRs and secretaries for her two offices.  *See id.* at 13, 23, 36, 179.  She determined her own advertising. *Id.* at 39-40.  To increase sales, she also elected to buy leads from a third-party service.  *Id.* at 52-55.  She paid for her agents' office rent (*id.* at 83) and purchased office equipment, furniture, decorations, and supplies for her branch office (*id.* at 90-91).  Lovelady invested over $80,000 in her agency in 2013 and $70,000 in 2014.  *Id.*  "[A]ll in all, Connie [Lovelady] did a pretty solid job."  Whitney Dep. at 235.

Plaintiffs' skill and initiative had a direct impact on their individual success and ability to grow their income.  Brown 1/4/21 Decl. ¶ 13; *see also* Hurt 1/4/21 Decl. ¶ 19. This factor, accordingly, weighs in favor of independent contractor status.

### E.    The Permanency of the Relationship

There are no "bright-line" rules under the economic realities test's "permanency" factor, and "[t]he inferences gained from the length of time of the relationship depend on the surrounding circumstances." *Parrish*, 917 F.3d at 387.  Each of the Plaintiffs' contracts was terminable at will, with or without cause, by any party at any time.  *See, e.g.*, Ferguson Dep. Vol. 1 at Exh. 8, § 5.A. (TFB contact); Ferguson Dep. Vol. 2 at Exh. 36, § 6.A. (SFB Life contract).  Each Plaintiffs' contract has in fact been terminated; certainly, none were expected to be permanent.

The analysis does not end with counting the number of years that a particular contract endured.  The case law looks also to whether Plaintiffs worked exclusively for Defendants during that period. *See Thibault*, 612 F.3d at 846; *Parrish*, 917 F.3d at 387.  While Plaintiffs agreed not

to sell competitors' insurance products, they were free to engage in other businesses at the same time.   The record, including tax returns, shows that most of the Plaintiffs engaged in other business ventures and income-generating activities while contracted with Defendants.   Wheeler Dep. at 43-48 (oil wells); Martin Dep. at 156 (oil wells); Wheeler Dep. at 38-39, 50, 173, 287-89 (real estate, rentals, and cattle farming); Stanton Dep. at 32 ("family farm"); McCord Dep. at 94-97, 242 (dog breeding); Cook Dep. at 203-05 (antiques); Clements Dep. at 203, 206-09 (competitive roping); Blackwell Dep. at 157-158; 163 (roping and farming); Beakley Dep. at 117, 120-21 (show hogs).[18]

Courts also consider permanency of the relationship in conjunction with the plaintiff's ability to terminate relations with the defendant and take his or her organization and skillset elsewhere.   *See Parrish*, 917 F.3d at 387 ("Such a valuable skillset shows how the permanency of the relationship may, in reality, be not all that permanent.").   Plaintiffs here are not like workers with limited skills who are more restricted in their ability to "leave their work and transfer to new employment" because they had "nothing to transfer but their own labor."   *Id.*   As noted above, Plaintiffs possessed specialized, transferable skills, as a number have proven by taking on new positions in the insurance industry.   Ferguson, for instance, sought at one point to purchase his own insurance agency (Ferguson Dep. Vol. 2 at 37-38, 128); Blackwell now operates an agency for another carrier (Blackwell Dep. at 9); and Peek runs his own.  Peek Dep. at 173.

In sum, the permanency factor presents issues for the trier of fact involving the Plaintiffs' skillsets, the terminable nature and terminated status of their contracts as agency managers, their ability to transition their skills and experience to other opportunities, and the unique nature of the

---

[18] In contrast to their representation on tax returns and in the evidentiary record, these Plaintiffs seemed uniformly prepared to create disputed issues of fact by downplaying these ventures at deposition and claiming they were mere hobbies, handled entirely by their wives or children, or required little of their time. These conflicts themselves raise material fact disputes.

insurance industry. The record does not permit a finding in Plaintiffs' favor on this factor.

## IV.  OTHER FACTORS CONSIDERED BY COURTS WEIGH IN FAVOR OF INDEPENDENT CONTRACTOR STATUS AND PRECLUDE SUMMARY JUDGMENT FOR PLAINTIFFS

It is well-established that the so-called "*Silk* factors" are "non-exhaustive."  *Parrish*, 917

F.3d at 379.   In addition, the *Silk* case itself involved the Social Security Act ("SSA"), not the

FLSA,[19] and after the Treasury Department incorporated the *Silk* factors into proposed regulations,

Congress rejected them in favor of the traditional common law definition of "employee."[20]  The

U.S. Supreme Court has never adopted these *Silk* factors as a method for defining an "independent

contractor" versus an "employee" under the FLSA.  Based on the history of the *Silk* factors and

their rejection under the NLRA, the SSA, and ERISA,[21] there is no persuasive reason why the *Silk*

factors (or an "economic reality" test that varies among the Circuits) should be used to define an

"employee" under the FLSA instead of the traditional common law test.[22]  In *Darden*, the Supreme

Court applied the "presumption that Congress means an agency law definition for 'employee'

unless it clearly indicates otherwise."  *Id*. at 325.  Congress has not clearly indicated otherwise in

---

[19] *United States v. Silk*, 331 U.S. 704 (1947).

[20] *See* 85 Fed. Reg. 60602 (describing Congress's rejection of the "economic reality" Silk factors as "a dimensionless and amorphous abstraction").

[21] *See, e.g.*, *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992) ("*Hearst* and *Silk*, which interpreted 'employee' for purposes of the National Labor Relations Act and Social Security Act, respectively, are feeble precedents for unmooring the term from the common law.").

[22] Under the general common law test, the *Darden* Court explained:  "we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."  *Darden*, 503 U.S. at 323-24 (quotations and citations omitted).

the FLSA.  Consequently, if the issue reaches the Supreme Court, the Court should, and likely will, adopt the common law test to define "employee" under the FLSA.[23]

In any event, the "non-exhaustive" nature of the "economic realities" test invites the consideration of other relevant facts, and nothing in the law prevents consideration of other facts simply because they might also be encompassed within the common law test.  Indeed, the Supreme Court has stated that "the determination of the relationship" depends "upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).  The following facts are relevant in this case and show that Plaintiffs are independent contractors, further demonstrating that summary judgment for Plaintiffs would be improper.

### A.    Payment by Commissions Indicates Independent Contractor Status

The payment of commissions is a factor indicating independent contractor status, not employee status. *Weary v.* Cochran, 377 F.3d 522, 527 (6th Cir. 2004) ("the fact that Weary was paid solely upon a commission basis and did not earn a salary lends further support to the conclusion that he was an independent contractor"); *Jammal v. Am. Family Ins. Grp.*, 2017 WL 3268032, at *16 (N.D. Ohio Aug. 1, 2017) ("The payment of commissions based on sales, rather than payment of a set salary supports an independent contractor relationship."), *rev'd on other grounds*, 914 F.3d 449 (6th Cir. 2019); *Cosgriff v. Valdese Weavers LLC*, 2012 WL 1071497, at *9 (S.D.N.Y. Mar. 30, 2012) (fact that defendant paid plaintiff on the basis of commissions only was one of several factors that supported conclusion that plaintiff was an independent contractor). In this case, it is undisputed that Plaintiffs were paid through various types of commissions.  In

---

[23] *Darden* is sometimes cited, erroneously, for the proposition that the Supreme Court held the definition of "employee" under the FLSA should be broader than the common law.  *Darden*, however, addressed the definition of employee under ERISA, not the FLSA, and *Darden*'s comments regarding the FLSA are a classic example of dicta.  *See Darden*, 503 U.S. at 325-26.

addition, these commissions were guaranteed to ensure that the Plaintiffs were highly compensated.[24]   These facts are relevant and weigh in favor of independent contractor status.

**B.      Plaintiffs' Use Of Corporate Entities To Operate As Agency Managers Indicates That They Were Independent Contractors**

The Fifth Circuit has said that the ultimate question in determining whether a person is an independent contractor is whether they are "in business" for themselves.  *Thibault*, 612 F.3d at 849.  Ferguson formed a corporate entity, Christopher Ferguson Services, Inc. ("Ferguson Inc."), to operate as Agency Manager of Matagorda County, and all commission income was paid to this entity.  Ferguson Inc. paid salaries to Ferguson and his wife and operated as a business.  ECF No. 312-4 (Manz Decl. ¶¶ 5-6 & Exhs. B-G); Ferguson Dep. Vol. 1 at 29, 61, 63-64, 127; Ferguson Dep. Vol. 2 at 68.  Clements similarly contracted through an entity and entered into Incorporated Agency Managers Contracts with the Companies.  Clements Dep. at 63, 106-07, 170.  Ferguson and Clements made the decision to operate through corporations on their own, and the other Plaintiffs had the option of doing so.  "Employees" do not enter into employment relationships by forming corporate entities to run a business or an agency.  These facts are relevant and show that Plaintiffs were independent contractors as opposed to employees.  *See Hickey v. Arkla Industries, Inc.*, 699 F.2d 748, 752 (5th Cir. 1983) (noting that plaintiff "was allowed to establish his own business organization" in deeming him an independent contractor under ADEA).

**C.      Plaintiffs' Tax Treatment Weighs In Favor Of Independent Contractor Status**

Similarly, Plaintiffs' treatment of their agency manager operations as business operations for tax purposes is relevant to demonstrating that they were "in business for themselves."[25]   The

---

[24] *See* Defendants' Motion for Partial Summary Judgment on the Claims of Plaintiff Christopher Ferguson (ECF No. 308) at 2, 4-6; Defendants' Joint Opposition to Plaintiffs' Partial Motion for Summary Judgment on the White Collar Exemptions (ECF No. 315) at 3-5, 6-10.

[25] *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998).

"tax treatment of the hired party" is expressly considered when "determining whether a hired party is an employee under the general common law of agency." *Darden*, 503 U.S. 324-25.  Indeed, the fact that an individual "deducts costs as business expenses or identifies himself as self-employed on personal tax returns weighs in favor of finding an independent contractor relationship." *Hennighan v. Insphere Ins. Solutions, Inc.*, 38 F. Supp. 3d 1083, 1100 (N.D. Cal. 2014) (construing California employment law); *see also Hickey*, 699 F.2d at 750 (similar).[26]

The record is undisputed that the Plaintiffs (who were operating a sole proprietorships in lieu of corporations) classified themselves as self-employed on their tax returns and took deductions for self-employment taxes.  *See, e.g.*, Wheeler Dep. at 156-64; Blackwell Dep. at 143-44; Beakley Dep. at 97-98.  All of the Plaintiffs incurred and deducted business expenses from their tax returns, which offset their taxable income, reduced their tax liability, and impacted their profitability.  *See, e.g.*, Wheeler Dep. at 156-64; Beakley Dep. at 98, 120; Martin Dep. at 169-70; Blackwell Dep. at 146, 167; Henry Dep. at 186-87, 192.  Plaintiffs' tax treatment is relevant and weighs in favor of holding that Plaintiffs were independent contractors and not employees under the FLSA.

## **CONCLUSION**

For the reasons set forth above, the Motion to declare all 12 Plaintiffs' "employees" under the FLSA is precluded by countless disputed issues of material fact and should be denied.

---

[26] The Fifth Circuit has on at least one occasion considered an individual's tax treatment when making an independent-contractor determination under the FLSA, despite its absence as an enumerated *Silk* factor.  *See Carrell v. Sunland Construction, Inc.*, 998 F.2d 330, 333-34 (5th Cir. 1993) (welder's classification of himself as "self-employed," and how he reported income and business expenses, on his tax returns supported a finding that he was in business for himself).

Dated:  January 4, 2021

Respectfully submitted,

By: _/s/ Markham R. Leventhal_

MARKHAM R. LEVENTHAL
mleventhal@carltonfields.com
SCOTT ABELES
sabeles@carltonfields.com
CARLTON FIELDS, P.A.
Suite 400 West
1025 Thomas Jefferson Street, NW
Washington, DC 20007
Telephone:  (202) 965-8189
Facsimile:  (202) 965-8104

CATHLEEN BELL BREMMER
cbell@carltonfields.com
CARLTON FIELDS, P.A.
Suite 1000
4221 West Boy Scout Boulevard
Tampa, Florida 33607-5780
Telephone:  (813) 223-7000
Facsimile:  (813) 229-4133

IRMA REBOSO SOLARES
isolares@carltonfields.com
STEPHANIE A. FICHERA
sfichera@carltonfields.com
CARLTON FIELDS, P.A.
2 MiamiCentral, Suite 1200
700 NW 1st Avenue
Miami, Florida 33136-4118
Telephone:  (305) 530-0050
Facsimile:  (305) 530-0055

*Attorneys for Southern Farm Bureau
Life Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of January, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will provide service on all counsel of record identified below via transmission of Notices of Electronic Filing generated by CM/ECF:

John Eddie Williams, Jr.
jwilliams@williamskherkher.com
Brian A. Abramson
babramson@williamskherkher.com
Sean M. McCarthy
smccarthy@williamskherkher.com
Williams Kherkher Hart Boundas, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
Telephone: (713) 230-2200
Facsimile: (713) 643-6226

Kelly E. Cook
kcook@wylycooklaw.com
Warren A. Berlanga
wberlanga@wylycooklaw.com
Wyly & Cook, PLLC
4101 Washington Ave., 2nd Floor
Houston, Texas 77007
Telephone:  (713) 236-8330
Facsimile:  (713) 863-8502

Avi Moshenberg
avi.moshenberg@mhllp.com
Nick Lawson
nick.lawson@mhllp.com
William B. Thomas
william.thomas@mhllp.com
McDowell Hetherington, LLP
1001 Fannin, Suite 2700
Houston, Texas 77002
Telephone:  (713) 337-5580
Facsimile:  (713) 337-8850

*Attorneys for Plaintiffs*

Barry Moscowitz
bmoscowitz@thompsoncoe.com
Leslie W. Richardson
lrichardson@thompsoncoe.com
Farsheed Fozouni
ffozouni@thompsoncoe.com
Thompson Coe Cousins & Irons, L.L.P.
700 North Pearl Street, Suite 2500
Dallas, Texas 75201
Telephone:  (214) 871-8200
Facsimile:  (214) 871-8209

*Attorneys for Defendants Texas Farm*
*Bureau Business Corporation, Texas*
*Farm Bureau Casualty Insurance*
*Company, Texas Farm Bureau Mutual*
*Insurance Company, Texas Farm Bureau*
*Underwriters, Farm Bureau County*
*Mutual Insurance Company of Texas,*
*and Texas Farm Bureau*

_____ */s/ Markham R. Leventhal* _____

124510317