**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER FERGUSON, individually and on behalf of others similarly situated,** | § § § | |
| **Plaintiff,** | § § | **CIVIL NO. 6:17-CV-00111-ADA-JCM** |
| **v.** | § § | |
| **TEXAS FARM BUREAU, et. al.,** | § § | |
| **Defendants.** | § § § § | |

### REPORT AND RECOMMENDATION OF
### THE UNITED STATES MAGISTRATE JUDGE

**TO:   THE HONORABLE ALAN D ALBRIGHT,
         UNITED STATES DISTRICT JUDGE**

This Report and Recommendation is submitted to the Court pursuant to 28 U.S.C. § 636(b)(1)(C), Fed. R. Civ. P. 72(b), and Rules 1(f) and 4(b) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

Before the Court is Plaintiffs' Motion for Partial Summary Judgment on Employee Status, ECF No. 333; Plaintiffs' Motion for Partial Summary Judgment on the White Collar Exemptions, ECF No. 292; Plaintiffs' Motion for Partial Summary Judgment on Good Faith, ECF No. 298; Plaintiffs' Motion for Partial Summary Judgment on Inapplicable Affirmative Defenses, ECF No. 299; and Plaintiffs' Motion for Partial Summary Judgment on Defendants' Outside-Sales-Exemption Affirmative Defense, ECF No. 302. The Court has also considered all responses, replies, objections, and sur-replies (as applicable) to the previously listed Motions.

1

For the following reasons, the undersigned **RECOMMENDS** Plaintiffs' Motion for Partial Summary Judgment on Employee Status (ECF No. 333) be **GRANTED**, Plaintiffs' Motion for Partial Summary Judgment on the White Collar Exemptions (ECF No. 292) be **DENIED**, Plaintiffs' Motion for Partial Summary Judgment on Good Faith (ECF No. 298) be **GRANTED**, Plaintiffs' Motion for Partial Summary Judgment on Inapplicable Affirmative Defenses (ECF No. 299) be **GRANTED**, and Plaintiffs' Motion for Partial Summary Judgment on Defendants' Outside-Sales-Exemption (ECF No. 302) be **GRANTED.**

# I.     BACKGROUND

This suit arises from alleged violations of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 et seq. ("FLSA"), by Defendants. Pl.'s Compl. at 18–19, ECF No. 1. Plaintiffs[1] are a conditionally certified class of agency managers who worked for Defendants[2] between 2014 and 2017. Order Adopting Report and Recommendation Granting Pl.'s Mot. to Certify Class at 6–7, ECF No. 128. Plaintiffs seek overtime compensation from Defendants under the FLSA, alleging that Plaintiffs were misclassified as independent contractors. Pl.'s Compl. at 2.

The present dispute primarily concerns several affirmative defenses raised by Defendants. Plaintiffs seek summary judgment on Defendants' affirmative defenses involving the so-called "white collar" exemptions, the affirmative defense of good faith, a number of equitable defenses (including estoppel, waiver, unclean hands, laches, and what is known as the "offset defense"), and the "outside sales" exemption. *See* Pls.' Mots., ECF Nos. 292, 298–99, 302. Plaintiffs also ask

---

[1] The Court is using the term "Plaintiffs" for convenience. The term is not indicative of certification status.
[2] The Court is using the term "Defendants" for convenience to include both "Farm Bureau Defendants" (every Defendant besides Southern Farm Bureau) and Southern Farm Bureau. Defendants have largely responded jointly with respect to the germane Motions for Partial Summary Judgment. Should one party act independently from the other, they will be distinguished and referred to as "Farm Bureau Defendants" and "Southern Farm Bureau," respectively.

the Court to classify Plaintiffs as employees under the FLSA as a matter of law. *See* Pls.' Mot. on Emp. Status, ECF No. 333.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). A dispute is not genuine if the trier of fact could not, after an examination of the record, find for the nonmoving party. *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 578 (1986). The moving party bears the burden of showing that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That said, the moving party can satisfy its burden either by producing evidence negating a material fact or pointing out the absence of evidence supporting a material element of the nonmovant's claim. *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991). Throughout this analysis, the Court must view the evidence and all factual inferences in a light most favorable to the party opposing summary judgment. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

## III.   DISCUSSION

### A.  Plaintiffs' Motion on Employee Status Should Be Granted (ECF No. 333).

Plaintiffs move for summary judgment on the issue of worker classification, asking the Court to classify the twelve agency managers at issue as employees under the FLSA. *See* Pls.' Mot. on Emp. Status. In order to be eligible for overtime protections under the FLSA, an individual must be classified as an employee, although an employer can still claim exemptions in order to avoid liability for overtime compensation. 29 U.S.C. §§ 207(a), 213. The economic reality test, not a contractual provision, determines worker classification for purposes of the FLSA. *See Parrish v. Premier Directional Drilling*, L.P., 917 F.3d 369, 388 (5th Cir. 2019). The appropriate

analysis of economic reality shows that Plaintiffs are properly classified as employees as a matter of law. Therefore, the Court **RECOMMENDS** that Plaintiffs' Motion be **GRANTED**.

### 1.  The economic reality test determines worker classification under the FLSA.

Defendants have approached the depth of economic-reality jurisprudence buffet-style— selecting only the nuances that may lean in favor of their desired classification. Defendants emphasize that Plaintiffs all agreed to operate as independent contractors under their contracts. Farm Bureau Defs.' Resp. on Emp. Status at 3, ECF No. 331[3]; Southern Farm Bureau's Resp. on Emp. Status at 1, ECF No. 332. Noticeably absent in their analysis is the well-established truth that parties may not contract around the economic reality. Nearly every formative case cited by Defendants supports this truth. *See Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 387 (5th Cir. 2019) ("Citing well-established precedent from our circuit, the court, correctly, chose not to rely on any contractual agreement"); *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008) ("a person's subjective opinion that he is a businessman rather than an employee does not change his status for purposes of the FLSA") (citing *Brock v. Mr. W. Fireworks*, 814 F.2d 1042, 1049 (5th Cir. 1987)); *Thibault v. Bellsouth Telecomms.*, Inc., 612 F.3d 843, 845 (5th Cir. 2010) ("The contractual designation of the worker as an independent contractor is not necessarily controlling.").

As a preliminary note, because Fifth Circuit precedent could not be clearer on the matter, a contract classifying Plaintiffs as "independent contractors" does not determine worker classification. *Hopkins*, 545 F.3d at 343. To the contrary, the economic reality test is the appropriate means to determine worker classification under the FLSA. *Parrish*, 917 F.3d at 379–80.

---

[3] This Response has been incorrectly docketed as a Response to Plaintiffs' Motion on the Outside Sales Exemption.

**2. The economic reality is that Plaintiffs are "employees" under the FLSA.**

To determine an individual's status under the FLSA, courts evaluate the economic realities of the worker's situation. *Id.* Specifically, courts determine whether the alleged employee is economically dependent upon the business, or whether the individual is in business for himself. *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 845 (5th Cir. 2010). This "economic reality test" takes precedence over a contractual designation of the worker as an independent contractor. *See id.*

Within the context of the FLSA, courts routinely employ the non-exhaustive five-factor test from *United States v. Silk*, to determine economic reality. *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043 (5th Cir. 1987). These factors are: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the putative employee and employer; (3) the degree to which the "employee's" opportunity for profit and loss is determined by the "employer"; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Id.* (citing *United States v. Silk*, 331 U.S. 704, 715 (1947)); *see also Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008). Recently, the Fifth Circuit joined other circuits in applying an additional factor: whether the work performed is an "integral part" of the business. *See Hobbs v. Petroplex Pipe & Constr., Inc.*, 946 F.3d 824, 836 (5th Cir. 2020). No single factor is determinative, and the weight assigned to each factor depends on the facts of the case. *Id.* at 829.

Farm Bureau Defendants argue that Plaintiffs were "entrepreneurs, in business for themselves." Farm Bureau Defs.' Resp. on Emp. Status at 2. An analysis of the economic realities

of the twelve agency managers at issue, however, demonstrates that Plaintiffs are employees under the FLSA as a matter of law.

      **a.**   **The degree of control exercised by Defendants weighs in favor of Plaintiffs' classification as employees.**

While Plaintiffs have some discretion in their day-to-day affairs, their freedom does not reach the level of control that indicates status as an independent contractor. Control is only significant when it shows workers exert such a control over a meaningful part of the business that they stand as a separate economic entity. *Mr. W Fireworks*, 814 F.2d at 1049. "[T]he lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Id.*

Defendants only point to trivial aspects of the job that were in the control of Plaintiffs, including control over their schedules, daily activities, and *how* they sold or advertised insurance products—mere day-to-day affairs. *See* Farm Bureau Defs.' Resp. on Emp. Status at 8–9; Southern Farm Bureau's Resp. on Emp. Status at 8–9.

The Fifth Circuit rejected a nearly indistinguishable argument in *Hopkins*. *See Hopkins*, 545 F.3d at 342. Southern Farm Bureau counters by arguing that "[t]here is nothing 'undisputed' about the purported 'facts' set forth in Plaintiffs' Motion." Southern Farm Bureau's Resp. on Emp. Status at 2. Southern Farm Bureau goes as far as to imply that the facts presented by Plaintiffs constitute a Rule 11 violation. *Id.* The Court largely views Southern Farm Bureaus protestations on this ground as sounding in semantics; naturally, the facts as presented are viewed in the light most favorable to the non-movants (here, Defendants). *See Tolan*, 134 S. Ct. at 1866.

That said, under the economic realities test, undisputed facts are sufficient to rule on the issue as a matter of law. *Hopkins*, 545 F.3d at 342. In *Hopkins*, the Court stated "[the workers] possess a great deal of flexibility with regard to their hours and day-to-day affairs," yet still went

on to conclude that they were not in control because the insurance company controlled the "*meaningful* aspect of the business model such that the [workers] could not plausibly be considered 'separate economic entit[ies].'" *Id.* at 342–44 (emphasis added).

According to Farm Bureau Defendants, the Fifth Circuit reached this conclusion because those employees could only sell health insurance, whereas Plaintiffs here could sell home, auto, and life insurance—so long as they were Defendants' products or otherwise approved. Farm Bureau Defs.' Resp. on Emp. Status at 12. This attempt to distinguish from *Hopkins* is unpersuasive. Rather, the Fifth Circuit made clear that the prohibition of selling *competing* insurance products was the true reservation of control. *Hopkins*, 545 F.3d 338 (noting that one of the tenants of the employer's business was that workers could not sell competing products if they wanted to be compensated). This same prohibition—restricting Plaintiffs from selling competing products—is indisputably present in the case at bar.

Southern Farm Bureau raises the argument that Plaintiffs were not assigned to any agency or county, but that the decision was within their discretion. *See* Southern Farm Bureau's Resp. on Emp. Status at 4–6. This is, according to Southern Farm Bureau, because Plaintiffs had to apply, interview for, and, if accepted, enter a contract to manage a particular agency. *Id.* at 4. This argument sounds in semantics. While Plaintiffs were not commanded to a particular region without any action on their part, Defendants still had the final say in who went where. *See id.* No facts indicate that Plaintiffs could choose where they went unilaterally as Southern Farm Bureau seems to suggest. *See id.* ("Each Plaintiff had *complete* control over . . . what county or counties they decided to manage an agency [in]" (emphasis added)).

It is true that insurance is a highly regulated industry and compliance with industry regulations may demand some degree of control over employees and independent contractors

alike. Certainly, the exercise of requisite control should not be indicative one way or another if regulations demand it. *See* Southern Farm Bureau's Resp. on Emp. Status at 12–13 (explaining how legal or regulatory requirements are not probative as to whether a working relationship is one of employment or independent contracting). As such, Southern Farm Bureau asks the Court to ignore any facts indicating control (including the price of insurance policies, policy terms, underwriting and application approval, agent appointments, advertising, offices, equipment, records, and security) that are legal or regulatory requirements. *Id.* at 15–18. However, neither party has pointed out an insurance industry regulation that demands Plaintiffs be captive, perform tasks not expressed in a contract, or relocate to an assigned county. Defendants further fail to highlight a disputed *material* fact at issue that would alter the Court's analysis. Thus, as a matter of economic reality, Defendants were in control of Plaintiffs and this factor weighs in favor of Plaintiffs' classification as employees.

### b. Defendants' significant relative investment cuts in favor of Plaintiffs' status as employees.

Defendants had a greater relative investment in the business; this favors classification of Plaintiffs as employees. When applying the relative-investment factor, courts compare each worker's individual investment to that of the alleged employer rather than aggregating the alleged employees' investments. *Hopkins*, 545 F.3d at 344. It is true that Plaintiffs made substantial investments in their offices, training, and execution of professional responsibilities. *See, e.g.,* Farm Bureau Defendants' Resp. on Emp. Status at 5-6. Defendants, however, have a much greater overall investment in their own business. Broadly, Defendants expend hundreds of millions on the insurance business—an amount dwarfing any investment made by Plaintiffs. Pls.' Reply in Supp. Mot. on Emp. Status at 11, ECF No. 342. Southern Farm Bureau also raises the argument that just because *Hopkins* says not to aggregate Plaintiffs' investment, does not mean Defendants'

investment should be aggregated. Southern Farm Bureau's Resp. on Emp. Status at 22. Even so, Defendants' pertinent investments, not in the aggregate, still far outweigh that of the Plaintiffs.

Defendants' greater business investment remains even narrowing the scope of the investment, *i.e.*, as "confined 'to the specific job the employee undertakes.'" *Hobbs*, 946 F.3d at 832 (quoting *Thibault*, 612 F.3d at 847). Here, Defendants spend $2 million annually paying for the training and administration costs of Plaintiffs. Pls.' Mot. on Emp. Status, Ex. 16 at 19:71−20:75 (Dep. of Justin Ingram) (earning about $300,000–$400,000 a year and testifying that District Sales Managers earn around $200,000 a year); Ex. 17 at 21:78−81, 51:199−201 (Dep. of Chris Whitney) (earning about $300,000–$400,000 a year and testifying that DSMs earn about $240,000−$400,000 a year); Ex. 18 at 22:82 (Dep. of John Sharp) (earning about $320,000 a year); Ex. 19 at 36:141 (Dep. of Gary Wood) (earning about $320,000 a year); Ex. 20 at 13:46−47 (Dep. of John Parum) (earning between $260,000–$295,000 per year); Ex. 14 at 54:211−13 (Dep. of Texas Farm Bureau Corp. Rep. Sloan Brown); Ex. 15 at 22:82 (Dep. of Southern Farm Bureau Corp. Rep. David Hurt).

Defendants pay for underwriters to review insurance applications solicited by Plaintiffs and their agents and pays the 700 agents for whom agency managers (including Plaintiffs) are responsible. Pls.' Mot. on Emp. Status, Ex. 19 at 35:134; Ex. 14, at 44:171, 80:317; *see also English et al. v. Texas Farm Bureau, et al.,* No. 6:17-cv-00323-ADA-JCM (W.D. Tex., October 9, 2018), Defs.' Resp. to Mot. for Cond. Cert. at 5, ECF No. 85 (presenting evidence that agents received an average of over $100,000 per year in the *English* case). Additionally, Defendants rent facilities, equipment, and staff to operate the agencies that Plaintiffs managed. Pls.' Mot. on Emp. Status, Ex. 19 at 9:33–10:34; Ex. 17 at 23:89–24:90. Thus, Defendants' investments far outweigh those of Plaintiffs, indicating that Plaintiffs are employees.

In fact, Plaintiffs' own financial investment may point to an employee classification. Defendants exercise a puzzling amount of control over certain investments—to the point of mandating the exact model of laptop that Plaintiffs must purchase and use for business operations. Pls.' Mot. on Emp. Status Ex. 23, at 47–52 (Dep. of Texas Farm Bureau Corp. Rep. Shane Jensen). These facts show that at least some of Plaintiffs' investments are mandated as opposed to an entrepreneurial investment in one's own business

Whether the Court views Defendants' investment in the business generally or in Plaintiff agency managers specifically, Defendants' investments outweigh Plaintiffs' investments. Further, Plaintiffs' personal investments were at least somewhat controlled by Defendants, negating an entrepreneurial aspect which may indicate independent contractor status. Thus, this factor weighs in favor of Plaintiffs' status as employees.

### c.  Defendants' ability to determine the Plaintiffs' opportunity for profit or loss favors Plaintiffs' status as employees.

The next factor considers whether Defendants could determine the Plaintiffs' opportunity for profit. The parties do not dispute that Defendants had significant influence over the profits and losses of Plaintiffs. Defendants had the ultimate say in the hiring and firing of agents, which affected the Plaintiffs' commissions. Pls.' Reply in Supp. Mot. on Emp. Status at 14. Defendants also decided which county the Plaintiffs would manage, which makes an undisputed difference in commission potential. *Id*. Likewise, Defendants maintained control over books of business that generated renewal commissions, a large source of income for Plaintiffs. *See id*. at 18. Finally, as previously noted, Defendants prohibited Plaintiffs from selling competing products. It is safe to say that the fate of Plaintiffs' profit potential was in Defendants' hands.

Defendants attempt to skirt clear Fifth Circuit guidance in *Hopkins* by claiming the applicability of misplaced caselaw.  Farm Bureau Defs.' Resp. on Emp. Status at 25–26 (citing

*Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 751 (5th Cir. 1983) (making a classification under the Age Discrimination in Employment Act and noting the economic realities test used in FLSA cases is "more liberal"); *Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 334 (5th Cir. 1993) (classifying welders as independent contractors because their profits depended largely on their ability to find work with other companies—which was indeed permitted under their agreement but not permitted in the case at bar); *Herman v. Express Sixty-Minutes Delivery Service, Inc.*, 161 F.3d 299 (5th Cir. 1998) (classifying as independent contractors courier drivers who could work for other courier delivery systems)).

Tellingly, the insurance company in *Hopkins* likewise relied on many of these cases; the Fifth Circuit rejected these arguments. *See, e.g., Hopkins*, 545 F.3d at 344–45 (distinguishing *Hickey* because the salespeople there could sell competing products). Similarly, the Court also rejects Defendants' attempted rehash of these legal arguments. Because Defendants exercised exclusive control over major factors that determine profit and loss, this factor favors classifying Plaintiffs as employees.

### d. The skill and initiative required of Plaintiffs weighs toward Plaintiffs' classification as employees.

Under the "skill-and-initiative" factor, routine work which requires industry and efficiency is not indicative of independence and nonemployee status. *Hopkins*, 545 F.3d at 345. Generally, courts look for some unique skill set. *Id; See, e.g.*, *Carrell*, 998 F.3d at 333 (noting that pipe welding requires specialized skills).

Like the sales leaders in *Hopkins*, Plaintiffs here required only general skills to manage their offices and teams. *See Hopkins*, 545 F.3d at 345. "…[General management skills] are not specialized skills; they are abilities common to *all* effective managers." *Id.* (emphasis in original). Defendants argue that a license indicates some level of specialized skill. Farm Bureau Defs.' Resp.

on Emp. Status at 29–30. Defendants direct the Court to *Talbert v. Am. Risk Ins. Co.* in support of this proposition. No. CIV.A. H-09-1023, 2010 WL 1960124, at *3 (S.D. Tex. May 14, 2010), *aff'd*, 405 F. App'x 848 (5th Cir. 2010). But as Plaintiffs point out, *Talbert*'s analysis centered on the administrative employee exemption, an exemption that only applies to employees. Pls.' Reply in Supp. Mot. on Emp. Status at 18. Defendants also direct the Court to *Bates v. Bell Tel. Co. of Pa.*, an out-of-circuit case for the same proposition. No. CIV.A. 93-217, 1993 WL 379542, at *4 (W.D. Pa. July 13, 1993), *aff'd sub nom. Bates v. Bell Tel. Co. of Pennsylvania*, 22 F.3d 300 (3d Cir. 1994). The Pennsylvania court's reference to licensure is brief and the case dealt with the highly specialized field of automotive mechanics. *Id.* The Court is thus not persuaded that Plaintiff's licensure creates a material issue of fact with respect to this factor.

Southern Farm Bureau suggests that the "mere fact that Defendants generally contract Texas Farm Bureau agents or agency managers to fill open agency manger positions ***in and of itself*** demonstrates that the position is specialized." Southern Farm Bureau's Resp. on Emp. Status at 28–29 (emphasis in original). However, industry knowledge and efficiency is not indicative of independent-contractor status. *Hopkins*, 545 F. 3d at 345 (citing *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d at 1314 which held that "[r]outine work which requires industry and efficiency is not indicative of independence and nonemployee status.").

As for initiative, like the Sales Leaders in *Hopkins*, Plaintiffs "had little opportunity to exercise initiative within the business." *Hopkins*, 545 F.3d 345 (quoting *Mr. W Fireworks*, 814 F.2d at 1053). Defendants controlled "[a]ll major components open to initiative—advertising, pricing, and most importantly the choice of [insurance-policy providers] with which to deal." *Id.* Defendants similarly prevented the Plaintiffs "from exercising true initiative" by "controll[ing] the

ultimate hiring and firing" of agents. *Id.*. Thus, this factor weighs in favor Plaintiffs' status as employees.

### e.   The "permanency-of-the-relationship" factor favors Plaintiffs' status as employees.

Relevant to the "permanency" factor here is that Plaintiffs had all worked for Defendants for several years, under indefinite contract terms, and without permission to sell competitive products. Pls.' Mot. on Emp. Status, Ex. 15 at 35:134−37; Ex. 16 at 3:8−9; Ex. 17 at 10:37−11:39; Ex. 19 at 28:108; Ex. 20 at 34:132−33; Ex. 22 at 16:38 (Dep. of Mark Katzfey). In *Eberline v. Media Net, L.L.C.*, the Fifth Circuit concluded that "no reasonable jury could have concluded that [the permanency of the relationship] factor favored independent contractor status," when the relationship between the parties was indefinite, with a one-year contract subject to automatic renewals. 636 F. App'x 225, 229 (5th Cir. 2016). Here, under similar circumstances, the permanency factor weighs in favor Plaintiffs' status as employees.

Like the individuals in *Hopkins*, and unlike the salesman in *Hickey*, the Plaintiffs could not easily terminate the relationship and take their business organization elsewhere. Pls.' Mot. on Emp. Status, Ex. 14 at 64:252−65:256; *compare Hickey*, 699 F.2d at 752 (where salesman was permitted to sell competitors' products and take his talents to other manufactures), *with Hopkins*, 545 F.3d 338 ("The foundation of the Sales Leaders' business organization—their team of subordinate salesmen—belonged exclusively to [the employer]."). The Plaintiffs' work was always on a general basis, not a project-by-project basis. Pls.' Mot. on Emp. Status, Ex. 14 at 73:286−89; Ex. 16 at 31:121−32:22; Ex. 17 at 44:172−45:74; Ex. 19 at 37:142−43. Additionally, the shortest tenure among the Plaintiffs is five years as an agent and three years as an agency manager. Pls.' Mot. on Emp. Status, Ex. 9. Thus, Plaintiffs were working for several years, for indefinite terms,

without permission to sell competitive products. As a matter of economic reality, the permanency factor weighs in favor of employee status for the Plaintiffs.

### f.  The Plaintiffs were an integral part of the Defendants' business, favoring Plaintiffs' status as employees.

While not part of the traditional five *Silk* factors, the Fifth Circuit has recently demonstrated use of an "integral part of the business" factor to consider how integral workers are to the business at hand. *Hobbs*, 946 F.3d at 836. The more integral the worker's services are to the business, the more likely it is that the parties have an employer-employee relationship. *Id.* (quoting *Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1055 (6th Cir. 2019)).

Plaintiffs exemplify the "integral part" factor. Only Plaintiffs (agency managers) and agents sell Defendants' insurance. *See* Pls.' Mot. on Emp. Status, Ex. 14 at 52:204−05; Ex. 15 at 4:11−12; Ex. 16 at 3:6−7; Ex. 17 at 9:30−31. Only Plaintiffs train and supervise over 700 agents on a day-to-day basis. *See* Pls.' Mot. on Emp. Status, Ex. 16 at 6:18−20; Ex. 17 at 17:63. No one else sells insurance for Defendants or recruits agents to sell Defendants' products. Pls.' Mot. on Emp. Status, Ex. 17 at 7:25–9:31. Defendants agree that agency managers, such as Plaintiffs, are essential to Defendants' business model. *Id;* Ex. 14 at 52:205−53:207; Ex. 15 at 19:70−72; Ex. 17 at 9:33 (agreeing that agency managers are "critical to Farm Bureau's business model"); Ex. 18 at 37:142 (agreeing that "agents and agency managers are critical" to Defendants' business). Without the Plaintiffs, much of Defendants' business could not function. In other words, Plaintiffs were integral to Defendants' business—a factor weighing in favor of employee status.

### 3.  Summary judgment on Plaintiffs' employee status is appropriate.

Under the legal standard of the economic reality, using the non-exhaustive *Silk* factors and considering only undisputed facts, Plaintiffs were employees for purposes of the FLSA.

Accordingly, the Court **RECOMMENDS** that Plaintiffs' Motion for Partial Summary Judgment on Employee Status should be **GRANTED**.

**B. Plaintiffs' Motion on White Collar Defenses Should Be Denied (ECF No. 292).**

Defendants invoke the so-called "white collar" exemptions as an affirmative defense.[4] Southern Farm Bureau's Am. Answer at 12−13, ECF No. 159; Farm Bureau Defs.' Am. Answer at 13−14, ECF No. 160. Under these exemptions, employees classified as administrative, executive, or highly compensated employees do not receive overtime protections under the FLSA, allowing employers to avoid liability for overtime compensation. 29 C.F.R. §§ 541.100(a)(1), 541.200(a)(1), 541.601(b)(1) (2004).

Plaintiffs move for partial summary judgment, asking the Court to find as a matter of law that the white collar exemptions do not apply to Plaintiffs because Plaintiffs were not paid on either a salary basis or a fee basis. Pls.' Mot. on White Collar Exemptions, ECF. No. 292. Defendants, however, point to issues of material fact regarding whether Plaintiffs were paid on a salary basis or fee basis as required for the white collar exemptions. Defs.' Resp. on White Collar Exemptions at 6, 20, ECF No. 315. Therefore, the Court **RECOMMENDS** that Plaintiffs' Motion be **DENIED**.

> **1. White collar defenses raised by Defendants do not apply if workers were not paid on either a salary basis or a fee basis.**

The FLSA generally requires that employers pay overtime wages to employees who work more than 40 hours in a calendar week. 29 U.S.C. § 207(a)(1). However, under the so-called white collar exemptions, administrative, executive, or highly compensated employees are not guaranteed overtime protections. 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.601 (2004). Employees who are not

---

[4] While Defendants raised the defense separately in their respective Answers, Farm Bureau and SFB filed a Joint Opposition in response to Plaintiffs' Partial Motion for Summary Judgment (Defs.' Resp. on White Collar Exemptions, ECF No. 315).

paid on either a salary or fee basis cannot be classified as administrative, executive, or highly compensated. 29 C.F.R. §§ 541.100(a)(1), 541.200(a)(1), 541.601(b)(1) (2004). Defendants previously raised as affirmative defenses all three white collar exemptions—administrative, executive, and highly compensated. *See* Southern Farm Bureau's Am. Answer at 12−13,  Farm Bureau Defs.' Am. Answer at 13−14.

The administrative exemption requires compensation on either a salary or fee basis. 29 C.F.R. § 541.200(a)(1) (2004). The executive exemption requires compensation on a salary basis. 29 C.F.R. § 541.100(a)(1) (2004). The highly compensated employee exemption requires that a portion of compensation be either on a salary or fee basis. 29 C.F.R. § 541.601(b)(1) (2004).

Plaintiffs claim that none of their compensation is paid on either a salary basis or a fee basis. Pls.' Mot. on White Collar Exemptions at 8−12. If this claim is true, Defendants cannot raise any of the white collar defenses. *See* 29 C.F.R. §§ 541.100(a)(1), 541.200(a)(1), 541.601(b)(1) (2004).  Material issues of fact, however, preclude summary judgment.

Salary basis compensation requires a compensation scheme that is guaranteed to meet the minimum amount. 29. C.F.R. 541.602(a) (2004). The parties dispute whether this guarantee existed, and both parties bring evidence to support their claims. *See* Pls.' Mot. on White Collar Exemptions; Defs.' Resp. on White Collar Exemptions. Fee basis compensation requires an employer to pay an agreed sum for a single job that is unique. 29 C.F.R. § 541.605 (2004). Plaintiffs' briefing focuses on the legal dispute of whether commissions can ever constitute fee basis and do not present sufficient facts. *See* Pls.' Mot. on White Collar Exemptions; Defs.' Resp. on White Collar Exemptions. The Court finds that commissions can constitute fee basis compensation, and further finds material issues of fact preclude summary judgment on this matter.

### a. A material issue of fact exists regarding whether Plaintiffs were paid on a salary basis.

A worker is paid on a salary basis for purposes of the FLSA if "the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). The Department of Labor clarified in an opinion letter the three critical elements to determine if compensation is on a salary basis: (1) regular receipt of (2) a predetermined amount that is (3) guaranteed.[5] The predetermined amount can be all or part of the entire compensation—an employee does not have to know the precise amount she will receive before the pay period, as long as the minimum weekly required amount is guaranteed. *Id.*

Here, Plaintiffs were indisputably paid on a commission basis. Pls.' Mot. on White Collar Exemptions at 4. Plaintiffs do not dispute that their compensation met the minimum weekly amount. See *id.* Plaintiffs' primary argument that their compensation was not on a salary basis is that it was purely commission-based. *Id.* at 4−7.

While it is true that pure commission-based compensation generally would not provide a guaranteed amount each pay period, this is not always the case. Here, Defendants present some evidence that, despite being commission-based, the compensation scheme was statistically certain and guaranteed to meet the minimum required amount. Defs.' Resp. on White Collar Exemptions

---

[5]"It is immaterial what specific terms (draw against commission, draw plus extra compensation, offset method) an employer uses when compensating employees on a fee or commission basis. <u>What matters is that the employee receives no less than the weekly-required amount as a guaranteed salary</u> constituting all or part of total compensation, which amount is not subject to reduction due to the quality or quantity of the work performed, and that the employee is never required to repay any portion of that salary even if the employee fails to earn sufficient commissions or fees. <u>Provided that these requirements are met, the employee will be considered to be paid "on a salary basis"</u> irrespective of any additional sums paid to the employee, such as the amount by which commissions earned for a specific period exceed the total of the weekly guarantee paid for the same period." Opinion letter from U.S. Department of Labor, Employment Standards Administration, Wage & Hour Division, FLSA 2006-43 (Nov. 27, 2006) (emphasis added).

at 4. This guaranteed compensation was allegedly based solely on existing in-force policies, exclusive of any new policies that Plaintiffs or their agents sold, and thus was not subject to variation or reduction based on the quality or quantity of their work. *Id.*

If such a scheme were truly guaranteed and statistically certain, this scheme could theoretically meet all three elements required by the salary-basis test. Although Defendants fail to conclusively establish that such a scheme did in fact exist, they have raised an issue of material fact sufficient to warrant denial of Plaintiffs' Motion.

The sole controlling authority, *Hewitt*, on which Plaintiffs originally relied was subsequently withdrawn and substituted (as noted in Pls.' Reply in Supp. Mot. on White Collar Exemptions at 5, ECF No. 319); now, even the substituted opinion has been vacated. *Hewitt v. Helix Energy Sols. Grp., Inc.,* 956 F.3d 341, 343 (5th Cir. 2020); *see also Hewitt v. Helix Energy Sols. Grp., Inc.*, No. 19-20023, 2021 U.S. App. LEXIS 6848 (5th Cir. Mar. 9, 2021). The case is now pending for en banc review. *Hewitt* is therefore not controlling.

Plaintiffs cite multiple cases addressing a draw system in which workers are paid an advance that is subject to reduction based on the quality or quantity of their work. *Edwards v. KB Home*, No. 3:11-CV-240, 2015 WL 6965387 (S.D. Tex. Nov. 10, 2015); *Bowman v. Builder's Cabinet Supply Co*., No. CIV.A. 04-201-DLB, 2006 WL 2460817, at *5 (E.D. Ky. Aug. 23, 2006); *Charbonneau v. Mortgage Lenders of Am. L.L.C.*, 2020 WL 5513596, at *1 (D. Kan. Sept. 14, 2020). While a draw system cannot constitute a salary basis compensation scheme, this does not preclude the current system from constituting a salary basis scheme. Plaintiffs do not show that their compensation scheme is subject to reduction after payment, as with a draw system. *See* Pls.' Mot. on White Collar Exemptions. And Defendants show that Plaintiffs' compensation may

contain a sufficient portion of guaranteed compensation. Defs.' Resp. on White Collar Exemptions at 11−13.

In 1981, a court implied that a commission structure cannot constitute compensation on a salary basis. *Dunlop v. Martin Brick Co.*, No. CA 6-322-E, 1981 WL 2342, at *1 (N.D. Tex. Sept. 30, 1981) ("Defendants compensated these employees on a commission or bonus method and therefore defendants were not entitled to assert the executive exemption. . . . "). However, the court's analysis centered around the fact that the guaranteed amount was too low. Thus, a material issue of fact remains with respect to this issue.

### b. Insufficient evidence exists to show that Plaintiffs were paid on a fee basis.

A worker is paid on a fee basis for purposes of the FLSA if "paid an agreed sum for a single job regardless of the time required for its completion." 29 C.F.R. § 541.605(a). These "piecework payments" apply to jobs that are "unique rather than for a series of jobs repeated an indefinite number of times and for which payment on an identical basis is made over and over again." *Id.*

Plaintiffs' primary argument rests on statutory construction. They claim that total annual compensation, as defined in the first sentence, cannot include commissions because the second sentence states that "total annual compensation may *also* include commissions" (emphasis added). Pls.' Mot. on White Collar Exemptions at 12.

> "Total annual compensation" **must include** at least $684 per week paid on a salary or fee basis as set forth in §§ 541.602 and 541.605, except that § 541.602(a)(3) shall not apply to highly compensated employees. Total annual compensation **may also include commissions**, nondiscretionary bonuses and other nondiscretionary compensation earned during a 52-week period. . . ."

29 C.F.R. § 541.601(b)(1) (emphasis added).

The Court acknowledges that other courts have found that commissions do not count toward total annual compensation. *Pierce v. Wyndham Vacation Resorts, Inc.*, 2017 WL 4480199,

at*5 (E.D. Tenn. Oct. 6, 2017) (stating in dicta that commissions do not constitute payment on a fee basis); *Charbonneau*, 2020 WL 5513596, at *7−8 (relying on *Pierce*); *Vivar v. Benjamin's Behavioral Health Servs.*, 2019 WL 6766842, at *3 (S.D. Tex. Dec. 11, 2019) (same). None of these opinions, however, are controlling and the Court reaches a different conclusion. The permissive second sentence of 29 C.F.R. § 541.601(b)(1) expressly states that commissions received at various times may count towards a total annual compensation, even when such commissions cannot be included in the mandatory dollar amount required from salary or fee basis compensation. 29 CFR 541.601(b)(1). This sentence, therefore, does not support Plaintiffs' position that commissions received on a regular or predictable basis cannot count toward the total annual compensation requirements referred to in the first sentence.

The determination of whether Plaintiffs' compensation scheme was on a fee basis is a fact-intensive issue. Material issues of fact exist regarding the uniqueness of each job and whether the managers were paid an agreed sum for a single job.

### 2. Summary judgment is not appropriate on white collar exemptions due to material issues of fact.

Plaintiffs are correct to conclude that *if* managers are not paid on either a salary or fee basis, Defendants cannot claim any white collar exemptions. *See* Pls.' Mot. on White Collar Exemptions at 3−4. However, Plaintiffs have not conclusively shown that mangers are not paid on either a salary or fee basis.

Defendants raise a genuine issue of material fact by alleging that a compensation scheme may exist in which Plaintiffs are guaranteed to be paid the required weekly amount. Defs.' Resp. on White Collar Exemptions at 4. As noted above, Plaintiffs have so far failed to show otherwise. Further, Plaintiffs fail to conclusively prove that the specific commission system at issue does not

constitute payment on a fee basis. The Court, therefore, **RECOMMENDS** that Plaintiffs' Motion for Partial Summary Judgment on White Collar Defenses be **DENIED.**

### C.  Plaintiffs' Motion for Partial Summary Judgment on Good Faith Should Be Granted (ECF No. 298).

Plaintiffs also move for summary judgment on Defendants' so-called "good-faith" defense. Pls.' Mot. on Good Faith, ECF No. 298. If Defendants are found to have violated the FLSA in bad faith, they will be liable for liquidated damages. 29 U.S.C. § 260. To avoid liability for liquidated damages, the employer must show both that he acted in good faith and that he had reasonable grounds for believing that he was not acting in violation of the FLSA. 29 U.S.C. § 260.  Because Defendants cannot show that they acted in good faith, the Court recommends that the Motion be granted.

#### 1.  Ruling on good faith as a matter of law is not premature.

Defendants suggest that ruling on the good-faith defense is premature because they have not been adjudicated as wrongdoers under the FLSA. Defs.' Resp. on Good Faith at 8, ECF No. 323. However, the fact that the good-faith issue could potentially be moot does not mean that it is not currently ripe. Defendants cite a number of cases in which courts have refused to rule on the good-faith issue until trial. Defs.' Resp. on Good Faith at 8–9. In these cases, however, defendant employers raise an issue of material fact on the good faith issue; such is not the case here.

For instance, Defendants cite *Gallegos v. Equity Title Co. of Am., Inc.*, where the court determined that the good faith issue "must be determined at trial." 484 F. Supp. 2d 589, 599 (W.D. Tex. 2007). The court's reasoning, however, is omitted from Defendants' argument. Judge Biery immediately went on to add that "[t]he summary judgment evidence does not permit a finding on this issue as a matter of law." *Id.* In other words, ruling on the good-faith issue at the summary-judgment stage was premature *under those facts.*

21

Similarly, Defendants cite *Clark v. Centene Co. of Texas, L.P.*, where the court determined that the good-faith issue would be determined at trial, not before. 44 F. Supp. 3d 674, 686 (W.D. Tex. 2014). Prior to reaching this conclusion, the court noted that the defendants had provided *some evidence* that it evaluated the plaintiffs' job duties, and that they relied on federal regulations in making their decision. *Id.* Had Defendants here likewise provided some evidence that it evaluated Plaintiffs' job duties in reference to FLSA, this Court may have reached the same conclusion. Nevertheless, there has been no genuine issue of material fact presented.

### 2. Defendants did not act in good faith in classifying Plaintiffs as independent contractors.

Under the FLSA, an employer is liable for unpaid wages and an additional equal amount as liquidated damages only after there has been a finding the worker is protected under the FLSA and that the employer violated the FLSA. 29 U.S.C. § 216(c). An employer may avoid liquidated damages in the event that it would be unfair to impose upon him more than a compensatory verdict. *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468 (5th Cir. 1979). To avoid such damages, the employer must show by plain and substantial evidence that: (1) it acted in good faith; and (2) it had reasonable grounds for believing that it was not acting in violation of the FLSA. 29 U.S.C. § 260; *Barcellona*, 597 F. 2d at 468. Nevertheless, it remains within the discretion of the trial court whether to award liquidated damages even with a showing of good faith by the employer. *Id.* The summary judgment evidence conclusively shows that the Defendants did not act in good faith, nor did they have reasonable grounds for believing that they complied with FLSA. Thus, as a matter of law, Defendants did not act in good faith in making the classification.

### a. Defendants did not show evidence of good faith.

Good faith requires more than ignorance of the prevailing law or uncertainty about its development. *Reich v. S. New England Telecommunications Corp.*, 121 F. 3d 58, 71 (2nd Cir.

1997). An employer must take active steps to ascertain the dictates of the FLSA. *Id.* Good faith requires some duty to investigate potential liability under the FLSA. *Barcellona*, 597 F. 2d at 469. Defendants attempt to show that they acted in good faith by pointing to several actions or omissions taken by others. Defs.' Resp. on Good Faith at 6. Defendants produced no evidence of the decision-making process used to make the independent contractor classification or any efforts to revisit that decision. Because "[a]pathetic ignorance is never the basis of a reasonable belief," Defendants did not act in good faith as a matter of law. *Barcellona*, 597 F. 2d at 469.

Defendants point to their Human Resources Department, whose responsibilities included understanding and verifying compliance with federal statutes and regulations related to employees of Defendants. Defs.' Resp. on Good Faith at 6. Defendants fail to name a single member of that department, fail to identify a time when that department had specifically verified compliance with FLSA, and fail to demonstrate that this department investigated the Plaintiffs' classification as independent contractors. *Id.* Conclusory identification of someone who *should* have acted is not evidence that they *did* indeed act.

Defendants argue in part that they acted in good faith because they never received any sort of notice from the DOL of a suspected violation. Defs.' Resp. on Good Faith at 4. Nowhere in the Act is that made a prerequisite, nor is the burden of FLSA compliance lifted from an employer until formal notice of a violation. The FLSA, instead, contemplates an employer taking active steps to ensure compliance. *See Reich,* 121 F. 3d at 71.

Another purported active step Defendants took is the training provided to Plaintiffs on the hourly limitations for the employees they supervised. Defs.' Resp. on Good Faith at 6. In other words, Plaintiffs were trained on how to protect others under FLSA, although not necessarily how

to protect themselves. The Court does not find this fact to indicate an active step with respect to the employees at issue.

Defendants suggest that their "inability to recount details regarding their original decisions to classify [Plaintiffs] as independent contractors" is irrelevant to the good-faith analysis because it was made 60 years ago. *Id.* Instead, Defendants suggest that the only relevant time period is between 2014 and 2017—during the Plaintiffs at-bar's employment. *Id.* Assuming, *arguendo,* that that is so, Defendants fail to show how this alternative timeframe would alter the Court's analysis. Simply moving the timeline does no good when the actions—or omissions—have been the same for 60 years, including within the suggested three-year window.

### b. Defendants do not have reasonable grounds to believe that they acted in compliance with FLSA.

To be relieved of liability for liquidated damages, an employer must also demonstrate reasonable grounds for believing that it was not violating the FLSA. *LeCompte v. Chrysler Credit Corp.*, 780 F.2d 1260, 1263 (5th Cir. 1986); *Barcellona*, 597 F.2d at 468. In order to believe something, it would seem necessary to know of something to believe in. "A good heart but an empty head does not produce a defense." *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 312 (7th Cir. 1986). Rather than make any inquiry into the FLSA, Defendants contend that, because the FLSA (and its accompanying economic-realities test) is complex, attempting to predict an outcome would be a lost cause. Defs.' Resp. on Good Faith at 12–14.

Accepting Defendants' argument as true, the good-faith determination in this context would become automatic. Specifically, Defendants argue that because the economic-realities test has been inconsistently applied, and the DOL has recognized that inconsistency, it is impossible to predict what the classification could be, even under *Hopkins v. Cornerstone America*, 545 F.3d 338 (5th Cir. 2008). Defs.' Resp. on Good Faith at 12–14. Under this logic, because it cannot be

24

predicted to a certainty, there is no use in trying. Thus, everyone would have reasonable grounds for belief until they are told otherwise. The complexity of the law cannot constitute reasonable grounds to proceed in ignorance.

Defendants cite *Steele v. Leasing Enterprises, Ltd.* to advance the previously mentioned argument that the DOL's silence gave them reasonable grounds to believe they were not violating the FLSA. Defs.' Resp. on Good Faith at 12 (citing *Steele v. Leasing Enterprises, Ltd.*, 826 F.3d 237, 247 (5th Cir. 2016)). However, unlike the employer in *Steele*, Defendants never asked the DOL for its opinion. *See Steele*, 826 F.3d at 247 (where the district court found that defendants acted reasonably and in good faith because the DOL advised them that the offset conformed with the FLSA). Instead, Defendants waited for someone to tell them that Defendants were non-compliant with the FLSA. *See* Defs.' Resp. on Good Faith at 4 (mentioning that Defendants "never received any sort of notice from the DOL").

Ironically, Defendants argue that because none of the Plaintiffs formally complained to Defendants—until now—that their work conditions entitled them to overtime pay, Defendants had no reason to know of an FLSA violation. Defs.' Resp. on Good Faith at 5. Prior employee complaints are not a prerequisite to FLSA protections. In fact, FLSA makes it clear that the employer bears the burden of compliance. *See Barcellona*, 597 F.2d at 469. Thus, Defendants may not shift the consequences of its own inaction.

Defendants fail to produce a single piece of evidence that demonstrates that they thought about how the FLSA applies to the classification of Plaintiffs. As Plaintiffs point out, Courts have relied on as little as an interrogatory response citing reliance on a field operation handbook. *See Clark v. Centene Co. of Texas, L.P.*, 44 F.Supp.3d 674, 685 (W.D. Tex. 2014) ("Although this is a slim reed, it is sufficient to establish, for summary judgment purposes, [defendant] relied as it

alleges."). Nevertheless, Defendants have failed to meet even this low burden. The Court, therefore, **RECOMMENDS** that Plaintiffs' Motion for Partial Summary Judgment on Good Faith be **GRANTED.**

### D. Plaintiffs' Motion on Inapplicable Affirmative Defenses Should Be Granted (ECF No. 299).

Defendants raise the equitable defenses of estoppel, waiver, unclean hands, laches, and also claim that, if Defendants are liable for overtime compensation, they are entitled to an offset.[6] Southern Farm Bureau's Am. Answer at 11, 14; Farm Bureau Defs.' Am. Answer at 12, 14−15. Plaintiffs ask the Court to find as a matter of law that these defenses do not apply. Pls.' Mot. on Inappl. Aff. Defenses, ECF No. 299. The Court finds that all of these defenses are prohibited in FLSA disputes apart from narrow exceptions which do not apply to Defendants. *Martin v. PepsiAmericas, Inc.*, 628 F.3d 738, 742 (5th Cir. 2010); *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 347–48 (5th Cir. 2008). Further, the Court does not find that this case warrants new exceptions to permit these equitable defenses. Therefore, the Court **RECOMMENDS** that Plaintiffs' Motion be **GRANTED**.

#### 1. Defendants are not entitled to any offset because there has not been a prepayment of wages.

Generally, courts will not offset payments in favor of an FLSA violator. However, *Singer v. City of Waco* stands for the proposition that in very narrow circumstances, an employer may set off certain wage overpayments against the employees' overall damages award. 324 F.3d 813 (5th Cir. 2003). This narrow exception is faced with courts' continued disfavor toward offsets unless the money being set-off can be considered wages that the employer pre-paid to the plaintiff-

---

[6] While Defendants raised the defense separately in their respective Answers, Farm Bureau and SFB filed a Joint Opposition in response to Plaintiffs' Partial Motion for Summary Judgment (Defs.' Resp. on Inappl. Aff. Defenses, ECF No. 324).

employee. *See Martin v. PepsiAmericas, Inc.*, 628 F.3d 738, 742 (5th Cir. 2010) (finding that sums which were not advance payments of wages are inappropriate for a set-off). In other words, the only way Defendants would be entitled to any offset is if there was a prepayment of wages, and here, there was no prepayment. Defs.' Resp. on Inappl. Aff. Defenses at 9, ECF No. 324 (acknowledging that "the buy-out and post-termination payments issued by the Defendants were not technically paid in advance").

All wages paid to Plaintiffs were backward-looking for work that they had already performed. Defendants attempt to point to an additional benefit afforded to the Plaintiffs: post-termination, contractual buy-out payments. Defs.' Resp. on Inappl. Aff. Defenses at 6–10. The post-termination benefits, however, do not fit the narrow exception of pre-paid wages from *Singer*. *See Martin*, 628 F.3d at 742. The post-termination benefits in this case are distinguishable from the overpaid wages in *Singer*. *Id*. The buy-out, post-termination payments issued by Defendants were not paid in advance. Defs.' Resp. on Inappl. Aff. Defenses at 9. In fact, the alleged overpayments were not even paid to Plaintiffs during their employment. *Id*.

The Fifth Circuit clarified *Singer* in *Martin v. PepsiAmericas, Inc.,* 628 F.3d at 742–43. The defendants in *Martin* argued—like Defendants here—that the benefits paid were like the wages set off in *Singer* because, in both cases, the employer paid some extra money or benefits to the employee to which the employee was not otherwise entitled. *Id.* The Fifth Circuit called this argument a "misconstru[ction of] the reciprocal nature of the benefits bargained for in [a] severance agreement." *Id.* In *Martin*, unlike in *Singer*, the defendant was not entitled to set-off the benefits because the money and benefits paid to the employee were not wages or advances. *Id.* at 743. Such is the case here. As Southern Farm Bureau put it, "[t]he size of the buyout is in an Agency Manager's control." Southern Farm Bureau's Resp. on Emp. Status at 28. The post-

termination buy-out payments are not advances for work yet to be performed. Defs.' Resp. on Inappl. Aff. Defenses at 9. Instead, these are bargained-for payments resulting from work already performed by Plaintiffs during their employment. *Id.* Thus, Defendants are not entitled to a set off of those damages. *Martin*, 628 F.3d at 742–43.

Defendants advance the argument that the post-termination payments are not afforded to their *employees*, and that if the Plaintiffs are determined to be "employees" and not "independent contractors," they should no longer be entitled to the post-termination benefits. Defs.' Resp. on Inappl. Aff. Defenses at 8. This, however, is a separate contractual issue not before the Court. Whether or not the Plaintiffs' classification in this litigation affects the bargained-for benefits is an issue unrelated to the offset defense.

### 2. Defendants are not entitled to their equitable defenses.

Defendants' Response notes that the Fifth Circuit has never issued a general prohibition on equitable affirmative defenses in FLSA cases. Defs.' Resp. on Inappl. Aff. Defenses at 11. Courts have indeed found factual circumstance in which equitable defenses may be asserted. See *Clark v. Centene Co. of Texas, L.P.*, 44 F. Supp. 3d 674, 686 (W.D. Tex. 2014), *aff'd*, 656 F. App'x 688 (5th Cir. 2016). Defendants, however, incorrectly suggest that there is not bright-line guidance from the Fifth Circuit on the relevant defenses here—estoppel, waiver, unclean hands, and laches. Defs.' Resp. on Inappl. Aff. Defenses at 11. For every general prohibition of an equitable defense, there is a limited exception, none of which operate to save any of Defendants' affirmative defenses here.

Defendants acknowledge as much in their reply noting, "[w]hile the unique facts and record in this case do not precisely follow the pattern of the above [exceptions]," they "justify the application of equitable defenses in their own right." Defs.' Resp. on Inappl. Aff. Defenses at 13. Defendants' justifications are unpersuasive. The Fifth Circuit has rejected similar arguments and

offered sufficient bright-line guidance that warrants similar treatment here. *See Hopkins*, 545 F.3d at 347–48.

To justify new exceptions, Defendants recycle an unpersuasive argument: it is unfair for the Plaintiffs to agree to be independent contractors in their contract and now claim employee status under FLSA. Defs.' Resp. on Inappl. Aff. Defenses at 5. The Fifth Circuit has long acknowledged that a worker can be an employee under the Act while being an independent contractor for other purposes. *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 347–48 (5th Cir. 2008). Employee status is a separate inquiry that cannot be circumvented by contract. *Id.* The alleged inequity here is insufficient to give rise to a newly fashioned exception to any otherwise prohibited defense. Simply seeking FLSA protection is not the type of inequity that warrants a new exception.

### a.  Defendants are not entitled to an estoppel defense.

Estoppel provides only a narrow defense to FLSA claims and some courts have noted that it is generally unavailable. *Portillo v. Permanent Workers, L.L.C.*, 793 Fed. Appx. 255, 259 (5th Cir. 2019). More specifically, in *Brumbelow v. Quality Mills, Inc.*, the Fifth Circuit held on very narrow grounds that the plaintiff was estopped from recovering compensation in her FLSA claim because she intentionally underreported her hours to the employer. 462 F. 2d 1324, 1327 (5th Cir. 1972). In other words, the plaintiff could not recover because the FLSA violation was actually her fault. *Id.* Nevertheless, *Brumbelow* limited it application to its facts, which are distinguishable here. *See id.* Here, unlike the employer in *Brumbelow*, Defendants' potential FLSA violation was not done in detrimental reliance on any misrepresentation by the Plaintiffs.

To fit under *Brumbelow*'s shelter, Defendants must show that they paid wages in good-faith reliance on misreported hours. *Id.* Defendants cannot meet this burden. Plaintiffs did not misreport the hours they worked because they did not report any hours. Defs.' Resp. on Inappl.

Aff. Defenses at 14. Defendants did not keep track of the Plaintiffs' time as required by 29 U.S.C. § 211(c). *Id.* The *Brumbelow* court even emphasized that estoppel would be inappropriate where—despite an employee's misrepresenting his hours to the employer—the employer knew or had reason to know that the hours were misrepresented. *Brumbelow*, 462 F. 2d at 1327.

Courts in this circuit have not extended *Brumbelow* beyond circumstances in which an employer underpays as a result of good-faith reliance on misreported hours. *Portillo*, 793 F. App'x. at 259. Because there has been no good-faith reliance, misreported hours, or record of hours at all, the estoppel defense is unavailable to Defendants here.

### b. Defendants are not entitled to a waiver defense.

The Supreme Court has held that "the purposes of the Act require that it be applied even to those who would decline its protections." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 302 (1985). In other words, waiver is generally inapplicable in FLSA cases. *Id.* The claim of waiver stems from the testimony of several Plaintiffs that they never informed Defendants of their subjective belief that they were employees entitled to overtime pay. Defs.' Resp. on Inappl. Aff. Defenses at 15–16. Assuming, *arguendo,* that this Court would ignore clear Supreme Court guidance on the matter, these facts do not indicate that the Plaintiffs were waiving their FLSA protection by saying nothing.

As with any general rule, there are normally narrow exceptions. Here, waiver is a recognized defense under the FLSA only if the employee has accepted full payment of unpaid wages, as supervised by the Secretary of Labor or if an employee accepts payment under a court-approved settlement. *Coffin v. Blessey Marine Services, Inc.*, No. H-11-0214, 2011 WL 2193378, at *1 (S.D. Tex. June 6, 2011). Neither situation exists here. Because "the waiver defense is

unavailable without supervision by the Secretary of Labor or the Court," Defendants are not entitled to a waiver defense. *Portillo,* 793 F.App'x. at 259.

Notably, Defendants' argument for subjective intent runs contrary to the Supreme Court's reasoning in baring nearly all waiver claims. *See Tony & Susan Alamo Found.*, 471 U.S. at 302. The public policy supporting that holding is frustrated if employers could bargain with workers to waive benefits of FLSA. *See id.* ("employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act"). Thus, not only is Defendants' desired exception unpersuasive, but it is also inapposite to the general rule.

### c.  Defendants are not entitled to an unclean-hands defense.

Defendants sing a familiar tune in support of an unclean hands defense: Because the Plaintiffs believed that they were employees but never revealed this subjective belief, they cannot claim employee status now under FLSA. Defs.' Resp. on Inappl. Aff. Defenses at 15–16. To this familiar argument, there is a familiar response: courts routinely find employee status under the FLSA applies to workers who have signed independent contractor agreements. *Hopkins*, 545 F.3d at 347 (finding it "clearly possible" for a worker to be an employee under the FLSA even if he actually believes himself to be an independent contractor).

Even so, the unclean hands doctrine is only available when an individual's misconduct has "immediate and necessary relation" to the equity sought. *Henderson v. United States*, 575 U.S. 622, 1783 n.1 (2015). Thus, in order for the doctrine of unclean hands to provide equitable relief, an immediate and necessary relation must exist between the plaintiff's alleged wrongdoing, and the equity sought by the wrongdoing plaintiff. *Id.* Here, Defendants have not identified any cognizable wrongdoing by the Plaintiffs. Even if they could, the Plaintiffs have only brought

statutory legal claims—nothing sounding in equity. Thus, it would be impossible to find an "immediate and necessary relation" of any wrongdoing to a nonexistent equitable claim.

### d. Defendants are not entitled to a laches defense.

"[L]aches is a gap-filling doctrine, and where there is a statute of limitations, there is no gap to fill." *SCA Hygiene Products Aktiebolag v. First Quality Baby Products*, —— U.S. ——, 137 S. Ct. 954, 961, 197 L. Ed. 2d. 292 (2017). The Plaintiffs raised their claims within FLSA's statute of limitations period. 29 U.S.C. § 255(a). Contrary to initial pleadings, Defendants now claim that they are no longer pursing the defense of laches at this time. Defs.' Resp. on Inappl. Aff. Defenses at 11 n. 15. Instead, they would like to reserve the right to ask the Court for leave to reassert the defense if developments at trial would support its application. *Id.* Because no potential development would make laches applicable here, Defendants are not entitled to the defense. The Court, therefore, **RECOMMENDS** that Plaintiffs' Motion for Partial Summary Judgment on Inapplicable Affirmative Defenses should be **GRANTED** in full.

### E. Plaintiffs' Motion on Outside Sales Exemption Should Be Granted (ECF No. 302).

Defendants previously alleged that Agency Mangers, if employees, were outside sales workers and thus exempt from overtime protections.[7] Southern Farm Bureau's Am. Answer at 12; Farm Bureau Defs.' Am. Answer at 13. Plaintiffs now ask the Court to decide that Defendants cannot plead this affirmative defense. Pls.' Mot. on Outside Sales Exemption, ECF No. 302. In response, however, Defendants purport to withdraw their affirmative defense to force the Court to deny Plaintiffs' Motion as moot. Defs.' Resp. on Outside Sales Exemption, ECF No. 329.

---

[7] While Defendants raised the defense separately in their respective Answers, Farm Bureau and SFB filed a Joint Opposition in response to Plaintiffs' Partial Motion for Summary Judgment (Defs.' Resp. on Outside Sales Exemption, ECF No. 329).

The Court finds the Motion is ripe for ruling. The Court finds that the outside sales exemption does not apply because Plaintiffs did not make sales as their primary duty. 29 § C.F.R. 541.500(a). Accordingly, the Court **RECOMMENDS** that Plaintiffs' Motion be **GRANTED**.

**1. The Outside Sales Exemption affirmative defense does not apply to the case at bar.**

Defendants have pleaded the Outside Sales Exemption affirmative defense, which would shield Defendants from liability for overtime compensation under the FLSA. *See* Southern Farm Bureau's Am. Answer at 12; Farm Bureau Defs.' Am. Answer at 13. The Outside Sales Exemption applies to workers whose "primary duty" is "making sales" and who are "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 § C.F.R. 541.500(a). A "sale" includes "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 § C.F.R. 203(k).

Here, the primary duty of Plaintiffs is not making sales. Pls.' Mot. on Outside Sales Exemption at 2. In fact, Plaintiffs do not make sales within the meaning of the Outside Sales Exemption because they do not have authority to complete sales without needing the company's approval. *Id*. at 10−12. Therefore, as a matter of law, Defendants cannot use the Outside Sales Exemption affirmative defense.

**a. Plaintiffs' primary duty as agency managers was management.**

An agency manager's primary duty was to recruit and train sales agents. Pls.' Mot. on Outside Sales Exemption at 2. A primary duty is defined by the most important duty and informed by the amount of time spent on that duty. 29 C.F.R. § 541.700(a)−(b). Here, the highest priority for an agency manger is to train and recruit sales agents. *See* Pls.' Mot. on Outside Sales Exemption, Ex. 20 at 9:31 (Dep. of John Parum). An agency manager's job responsibilities consist of management, not sales. *See* Pls.' Mot. on Outside Sales Exemption, Ex. 19 at 24:91 (Dep. of

Gary Wood). An agency manager can face termination for failing to recruit enough sales agents. *See* Pls.' Mot. on Outside Sales Exemption, Ex. 16 at 4:13 (Dep. of Justin Ingram). An agency manager's "highest and best" use of time was recruiting and assisting sales agents. *See* Pls.' Mot. on Outside Sales Exemption, Ex. 21 at 4:10 (Dep. of Steve Hartgrove). Although Plaintiffs had the ability to also solicit sales, this was not their primary duty. Pls.' Mot. on Outside Sales Exemption at 2.

Defendants offer no evidence to dispute Plaintiffs' assertion that their primary duty was not sales. *See* Defs.' Resp. on Outside Sales Exemption. In fact, Defendants acknowledged this reality through the compensation scheme, in which Plaintiffs were compensated primarily with commissions on policies sold through the sales agents' efforts. Pls.' Mot. on Outside Sales Exemption at 4. Thus, the primary duty of the Agency Mangers was management—not sales.

### b. The sales-related activities of Agency Mangers did not constitute making sales because the company retained discretion to finalize sales.

Even when Plaintiffs engaged in activities related to sales, including pitching an insurance policy to a new client and receiving the client's commitment, these activities only constituted soliciting a policy—not making sales. Pls.' Mot. on Outside Sales Exemption at 10−12. Although controlling authority has never conclusively dealt with an analogous set of facts, the law appears to be relatively clear.

In *SmithKline*, the Supreme Court applied the Outside Sales Exemption, finding that workers made sales even though no transfer of title occurred on any goods or services. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 160 (2012). The Court said that the activities of the pharmaceutical salespeople constituted sales-making because the salespeople received the highest level of commitment legally possible from their clients. *Id.* at 166.

Here, Defendants retain the authority to reject applications not only for legal or technical insufficiencies, but also for business reasons after conducting a risk assessment. Pls.' Mot. on Outside Sales Exemption at 11. Defendants' contracts with Plaintiffs include a contractual provision reserving this authority. *Id.* Thus, the workers do not receive the highest level of commitment legally possible from their clients as in *SmithKline*. 567 U.S. at 160.

While not controlling, the Sixth Circuit found last year that "making sales" for the purpose of an Outside Sales Exemption rests on who is the final decision-making authority in each sale. *Hurt v. Commerce Energy, Inc.*, 973 F.3d 509, 517 (6th Cir. 2020). If the company retains discretion to finalize sales, the worker does not "make sales" because the link between the commitment and commission is too attenuated. *Id.* This was the case in *Hurt* because, to receive a commission, the workers had to secure a customer's commitment, submit an application, and wait for a third-party verifier to make a business decision. *Id.*

Plaintiffs give a helpful example of the hypothetical "Avon" lady who has the freedom to sell to anyone who will commit to buy her products. *Id.* at 13−14. Every time she receives a commitment from a client, she has authority to finalize a sale and she receives a commission. No attenuation exists between a commitment she receives from the client and the resulting commission she receives from the company. A New York District Court agreed that sales-making is negated by an attenuated link between the customer's commitment and the worker's commission. *Gorey v. Manheim Servs. Corp.*, 788 F. Supp. 2d 200, 207 (S.D.N.Y. 2011).

Unlike the "Avon lady," and similar to *Hurt*, Defendants retain the discretion to finalize sales. Pls.' Mot. on Outside Sales Exemption at 15−16. Defendants are the final decision-making authority—not an agency manager or sales agent. *Id*. For a sale to be final, an agent (or manager) solicits a customer's commitment, the customer submits an application to Defendants, and an

underwriter reviews the application and exercises business discretion to decide whether to accept or reject the application. *Id*. at 10−12. Thus, the link between commitment and commission is notably attenuated, as in *Hurt*.

Any agent or manager who engages in sales-related activities that fall short of actually making a sale, such as the activities Defendants hold out in an attempt to shield themselves with yet another inapplicable affirmative defense, is not "making sales." Therefore, as a matter of law, the Outside Sales Exemption cannot apply here.

### 2.  The Court will not deny the Motion as moot.

Defendants purport to withdraw this affirmative defense. Defs.' Resp. on Outside Sales Exemption at 2. They assert that the Court should therefore deny Plaintiffs' Motion as moot. *Id*. The Court, however, notes that the Motion is ripe for ruling and will not permit gamesmanship to benefit Defendants.

Contrary to their assertion, Defendants have not actually withdrawn the Outside Sales Exemption affirmative defense. Defendants never asked leave of the Court to amend their answer. Pls.' Reply Supp. Mot. on Outside Sales Exemption at 2, ECF No. 339. Defendants also claim that this is still a "viable defense" but offer no evidence to support their claim. Defs.' Resp. on Outside Sales Exemption at 2. Additionally, Defendants hardly veil an intent to assert this defense later when it may be more advantageous to them. *See id*. Further, as evidence that the Court should deny Plaintiffs' Motion as moot *without prejudice*, Defendants cite a case in which a nonmovant withdrew a defense and the Court denied the motion and struck the defense *with prejudice. Id.* (citing *Stross v. Hearst Commc'ns, Inc.*, 2020 WL 5250579, at *1 (W.D. Tex. Sept. 3, 2020)).

This court would not be the first in Texas to refuse such a request to deny a motion as moot. *See, e.g., VT, Inc. v. Geico Ins. Co., Civ. A.* 3:03-CV-0522-P, 2004 WL 1373132, at *2 n.4

(N.D. Tex. June 16, 2004). In *VT, Inc.*, the court granted a similar motion for summary judgment because the nonmoving party did not seek leave to amend its pleadings to withdraw the relevant defenses and did not respond to the merits of the moving party's motion. *Id.* For the same reasons, it would be a miscarriage of justice to deny this Motion as moot.

The Court, therefore, **RECOMMENDS** that Plaintiffs' Motion for Partial Summary Judgment on Outside Sales Exemption should be **GRANTED.**

## IV.    RECOMMENDATIONS

Upon consideration of the entire record in this case, and for good cause shown, the undersigned **RECOMMENDS** the following:

- That Plaintiff's Motion for Partial Summary Judgment on Employee Status (ECF No. 333) be **GRANTED;**

- That Plaintiffs' Motion for Partial Summary Judgment on the White Collar Exemptions (ECF No. 292) be **DENIED** for material issues of fact;

- That Plaintiffs' Motion for Partial Summary Judgment on Good Faith (ECF No. 298) be **GRANTED**;

- That Plaintiffs' Motion for Partial Summary Judgment on Inapplicable Affirmative Defenses (ECF NO. 299) be **GRANTED** as to all defenses listed; and

- That Plaintiffs' Motion for Partial Summary Judgment on Defendants' Outside-Sales-Exemption Affirmative Defense (ECF No. 302) be **GRANTED.**

## V.    OBJECTIONS

The parties may wish to file objections to this Report and Recommendation. Parties filing objections must specifically identify those findings or recommendations to which they object. The

District Court need not consider frivolous, conclusive, or general objections. *See Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc). Except upon grounds of plain error, failing to object shall further bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas*, 474 U.S. at 150-53; *Douglass*, 79 F.3d at 1415.

**SIGNED this 19th day of May, 2021.**

**JEFFREY C. MANSKE**
**UNITED STATES MAGISTRATE JUDGE**